**TEXAS SOUTHERN UNIVERSITY,**
Appellant,

v.

**STATE STREET BANK AND TRUST COMPANY, CMS Viron Corporation, and CMS Energy Resource Management Company, Appellees.**

Nos. 01–05–00758–CV, 01–06–00497–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 11, 2007.

Bill Davis, Office of the Attorney General, Austin, TX, for Appellant.

Felicia Harris Kyle, Kyle & Kyle, LLP, Pearland, TX, Ronald D. Cohen, Joe W. Redden, Jr., Russell S. Post, Erin H. Huber, Beck, Redden & Secrest, L.L.P., Houston, TX, John D. Hanify, Boston, MA, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

Texas Southern University, appellant, and State Street Bank and Trust Company, appellee, both filed motions for rehearing. Having considered the motions and responses, the Court finds the motions to be without merit. The Court, however, withdraws its Opinion and judgment issued June 8, 2006 and issues the following in its stead.

CMS Viron Corporation and CMS Energy Resource Management Company (collectively "Viron") and State Street Bank and Trust Company asserted numerous claims against one another and Texas

Southern University ("TSU") arising from an alleged contract between TSU and Viron. In this interlocutory appeal, TSU, a political subdivision of the State of Texas, appeals the trial court's denial of its pleas to the jurisdiction based on sovereign immunity.[1]

In four issues, TSU contends that (1) Viron has not obtained legislative permission to sue TSU; (2) a party cannot circumvent the State's immunity from suit by recasting a contract claim as one for inverse condemnation; (3) the Uniform Declaratory Judgments Act does not expand the court's jurisdiction; and (4) Viron did not possess a vested property right in the equipment and TSU acquired the equipment pursuant to its contract with Viron, not through the exercise of eminent-domain powers. We affirm in part and reverse and remand in part.

## I. FACTUAL[2] AND PROCEDURAL BACKGROUND

In an attempt to lower its energy costs, TSU solicited bids for "comprehensive energy conservation services," including "performing a comprehensive energy audit, and to include energy and maintenance-related staffing requirements and an evaluation of current staff qualifications," and "providing equipment and/or services, including all financing, necessary to achieve long-term, cost-effective energy efficiency, and reduce the University's operating costs." After soliciting bids for the project, on January 16, 1998, TSU notified Viron that the TSU Board of Regents had authorized "the award of a contract to Viron Energy Services for the referenced project." As part of the energy audit,

Viron submitted a proposed "Performance Based Energy Savings Agreement" ("Energy Savings Agreement") to carry out the corrective measures discussed in the energy audit. The Energy Savings Agreement called for six projects for the improvement of TSU's physical plant for a total price of $13,534,281. TSU agreed to pay $5,097,-546[3] in cash with the remaining $8,334,281 to be funded by a lease between TSU and Viron. In July 1998, after a meeting during which the Board of Regents authorized the TSU administration to proceed with the Energy Savings Agreement, the Energy Savings Agreement was executed by TSU's President, James M. Douglas, and James Mullaney of Viron.

Academic Capital, L.L.C. offered to provide financing for the proposed lease/purchase agreement. Academic Capital proposed that it would deposit approximately $8.3 million in an escrow account to be established to fund the purchase of the equipment necessary for the TSU project. From the escrow account, Viron would be paid in four equal installments of $2,083,570.25. Academic Capital designated its alter ego, Academic Services, as escrow agent under the escrow agreement.

In September 1998, Viron and TSU executed the Master State and Municipal Lease/Purchase Agreement ("the Master Lease") wherein TSU requested that Viron get the equipment. In the Master Lease, TSU certified that it had "the legal capacity to enter into [the] Master Lease." TSU was to retain title to the equipment; however, if TSU was in default, the title was to "re-vest immediately in and shall revert to [Viron] free of any right, title or interest of TSU."

---

**1.** Appellate cause number 01–05–00758–CV pertains to TSU's plea to the jurisdiction filed in response to State Street's claims, and appellate cause number 06–00497–CV pertains to TSU's plea to the jurisdiction filed in response to Viron's claims.

**2.** The "facts" have been extracted from State Street's and Viron's pleadings.

**3.** TSU also paid Viron $101,100 to compensate it for its work in preparing the energy audit.

The rental payment schedule found in the Master Lease provided for 20 semiannual payments of $554,818.43 [4] for a total of $11,122,869.93. The first payment was due on February 1, 2000 and the last payment on August 1, 2009. The rental payment schedule was signed by Harold Johnson, associate vice president of Facilities Planning and Operations for TSU.

An opinion letter from Cheryl Elliot Thornton, TSU's General Counsel, was attached as an exhibit to the Master Lease. In that letter, Thornton stated:

> The Master Lease is a governmental purpose obligation and constitutes a legal, valid and binding deferred payment obligation of [TSU], enforceable in accordance with its terms and does not constitute a debt of [TSU] under the laws of the State of Texas. In the event [Viron] obtains judgment against [TSU] for money damages in connection with the Master Lease, [TSU] will be obligated to pay such judgment. . . .
>
> . . . .
>
> . . . The signature of the official of [TSU] which appears on the Master Lease and the attached documents is true and genuine; I know him/her to hold the office set forth below his/her name. Such official is duly authorized to execute the Master Lease and the attached documents. I have attached hereto a copy of such authorization. . . .
>
> . . . .
>
> . . . This opinion may be relied upon by you and your assigns.

Viron, TSU, and Academic Services agreed that the previously-executed escrow agreement would become part of the Master Lease.

Viron assigned to Academic Capital its benefits under the Master Lease, and TSU executed its acknowledgment of the assignment which included its understanding that the payment schedule was unchanged. A few months later, Academic Capital and Academic Services assigned the Master Lease, which included the escrow agreement, to State Street Bank. Among the rights assigned were (1) all rights as the owner and lessor of the equipment; (2) all right, title and interest in and to the equipment; and (3) all right, title and interest in and to all payments to be made by TSU in connection with the equipment. In return, State Street advanced $8,547,545.51 into an acquisition fund to be used by Viron to finance the purchase and the delivery of the equipment. The acquisition fund was to be administered by Academic as an escrow account.

On April 2, 1999, TSU sent Viron a "Notice to Proceed" with the Thermal Plant Chiller Upgrade project.[5] Viron completed its work in March 2000.

As the project progressed, the first three required payments were made by Academic Capital from State Street's escrow account to Viron as scheduled on September 1, 1998; March 1, 1999; and September 1, 1999, each in the amount of $2,083,570.25. Viron contends, however, that it never received the final payment it was due. The payment was sent to State Street instead.

The first payment to be made by TSU under the Master Lease was due on February 1, 2000. At that time, TSU, via its new President and new General Counsel, asserted that the Master Lease was not a valid obligation of TSU and refused to make the payments.[6] Among other things,

---

4. The final payment was for $581,509.76.

5. These thermal chillers constituted the largest, both fiscally and physically, part of the contract.

6. State Street asserts that Viron concealed

TSU maintained that the purported Master Lease was void because the TSU representative had not been authorized by the TSU Board of Regents, the Texas Higher Education Coordinating Board, or in accordance with law, to enter into such an undertaking. When the first payment was due, Academic Capital paid the installment to State Street out of the Viron's escrow account. State Street contends that it was unaware that the money was not coming directly from TSU. To date, TSU has not made any of the lease payments due under the terms of the Master Lease, and the equipment remains on its campus.

Viron informed the Texas Attorney General's office of TSU's outstanding balance. TSU and Viron could not agree to everything; however, they did address Viron's work on the thermal chiller plant system. TSU paid Viron the balance of $5,100,000 due on that part of the project.[7]

In the summer of 2001, State Street learned that TSU was not making the required installment payments and also that the purported Master Lease "had not been authorized by TSU's Board of Regents, or the Coordinating Board, or in accordance with the law, and was therefore void and unenforceable." State Street notified TSU and Viron that these actions constituted defaults of the purported Master Lease and Viron was required to repurchase the purported Lease from State Street for the $7,621,451.27 unpaid balance

due to State Street. To date, it has not done so.

**State Street's Claims[8]**

State Street's third amended petition asserted an inverse condemnation claim against TSU and also sought the trial court's determination and declaration that (1) the purported lease and all related documents "were executed without the requisite authority" and are "void and unenforceable against TSU;" (2) TSU does not have any rights to the equipment; (3) State Street holds all rights, title and interest to the equipment; (4) TSU has "no right, title, or interest to the equipment and must return the equipment to State Street;" and (5) State Street is entitled to a constructive trust and return of the equipment to State Street.

In its plea to the jurisdiction, TSU argued that (1) State Street failed to allege any waiver of TSU's immunity from suit; (2) characterizing a contract dispute as a declaratory judgment claim does not confer jurisdiction on a trial court; (3) declaratory judgment seeking to establish a contract's validity may not be maintained without legislative permission; (4) State Street lacks standing to assert a claim for inverse condemnation; (5) State Street had no ownership interest prior to the assignment of the contract from Academic Capital to State Street; and (6) all of State Street's alleged right, title, and interest

from State Street TSU's position that the purported Master Lease and related instruments were void for lack of authority and the existence of other disputes between TSU and Viron, while at the same time Viron requested and received more than $6 million out of the escrow account.

7. State Street contends that Viron's attempted "release" had no effect on the status of the equipment or State Street's rights in it because (1) Viron had already assigned all right, title, and interest to the equipment to State

Street and (2) TSU had no legal or contractual right, title or interest in the equipment as it never had the requisite legal authority to enter into a contract with State Street as the owner of the equipment.

8. State Street also sought a declaratory judgment against the other defendants and asserted claims for conversion, unjust enrichment, breach of fiduciary duty, fraudulent transfer, alter ego and single business enterprise, and breach of contract, warranty, and covenants.

flow from the contract. There was no sworn denial of State Street's ownership.

Quintin Wiggins, TSU's Senior Vice President for Business and Finance, testified that the Master Lease was never valid, it was never authorized by the TSU Board of Regents or the Higher Education Coordinating Board, TSU was not the owner of the equipment, State Street had title to the equipment, and TSU had never made any lease payments on the equipment.

The trial court denied the plea to the jurisdiction as to State Street's claims without explanation.

**Viron's Claims[9]**

Viron's second amended counterclaim and third-party petition asserted numerous causes of action against TSU including breach of contract (breach of the Energy Audit Agreement, the Energy Savings Agreement, and the Master Lease),[10] unjust enrichment, inverse condemnation, and indemnification in the event that State Street recovered from Viron. Finally, Viron requested that the trial court make a "determination and declaration that the Master Lease and all related documents signed by any representative of TSU are valid, binding, and enforceable obligations of TSU."

In its plea to the jurisdiction, TSU argued that (1) Viron failed to allege waiver of TSU's immunity from suit in its contract causes of action; (2) Viron's declaratory judgment suit fails because it is seeking to enforce performance under a contract and is, thus, a suit against the State that cannot be maintained without legislative permission; and (3) "Viron lacks standing to assert an inverse condemnation claim as it seeks to assert the claim on behalf of State Street." The trial court issued a lengthy order denying TSU's plea. After recitation of the relevant factual allegations, the trial court found that, "in light of the extraordinary factual circumstances presented," the court could not conclude that TSU was "entitled to prevail" on its pleas to the jurisdiction. The trial court further stated in response to TSU's argument that Viron had no standing to assert a claim for inverse condemnation that, because there was a fact question "as to what extent [Viron] currently has an ownership interest in the equipment under the Master Lease ..., it is inappropriate at this time to deny the plea with prejudice as to the inverse condemnation claim." Finally, the trial court acknowledged that "ambiguity exists as to whether and [to] what extent a state agency can waive sovereign immunity by its conduct.... The [c]ourt, however, is unaware of definitive case law that precludes application of waiver-by-conduct doctrine to circumstances as potentially unique as those in this case."

TSU appeals the trial court's denial of its pleas to the jurisdiction.

## II. APPLICABLE LAW

### A. The Sovereign Immunity Doctrine

 Texas has long recognized that sovereign immunity, unless waived, pro-

---

**9.** Viron sued Academic Capital, Academic Services, and State Street for breach of fiduciary duty, breach of contract, conversion, negligence, gross negligence, fraud, tortious interference, misapplication of fiduciary property, civil conspiracy, and alter ego.

**10.** The Court is mindful that, under chapter 2260 of the Texas Government Code, the sole remedy of a private party asserting a breach-of-contract claim against the state is through an administrative process. *See* TEX. GOV'T CODE ANN. § 2260 (Vernon 2004). The Legislature, however, has amended chapter 2260 to specify that such administrative process does not apply to contracts "executed or awarded on or before August 30, 1999," such as those at issue here. *See* TEX. GOV'T CODE ANN. § 2260.002(2) (Vernon Supp.2005).

tects the State of Texas, its agencies, and its officials from lawsuits for damages, absent legislative consent to sue the State. *Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 265 (Tex.1980); *Griffin v. Hawn*, 161 Tex. 422, 341 S.W.2d 151, 152–53 (1960); *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847). Sovereign immunity embraces two principles: immunity from suit and immunity from liability. *Mo. Pac. R.R. Co. v. Brownsville Navigation Dist.*, 453 S.W.2d 812, 813 (Tex.1970). Immunity from suit bars a suit against the State unless the Legislature expressly consents to the suit. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex.2002). If the Legislature has not expressly waived immunity from suit, the State retains such immunity even if its liability is not disputed. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex.1997). Immunity from liability protects the State from money judgments even if the Legislature has expressly given consent to sue. *IT-Davy*, 74 S.W.3d at 853. The bar of sovereign immunity is a creature of common law and not of any legislative enactment. *Tex. A & M Univ.-Kingsville v. Lawson*, 87 S.W.3d 518, 520 (Tex.2002).

■ The Texas Supreme Court has long recognized that "it is the Legislature's sole province to waive or abrogate sovereign immunity." *Fed. Sign*, 951 S.W.2d at 409. The Legislature may consent to suits against the State by statute or by resolution. *Gen. Serv. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). The Legislature is better suited than the courts to weigh the conflicting public policies associated with waiving immunity and exposing the government to increased liability, the burden of which the general public must ultimately bear. *IT-Davy*, 74 S.W.3d at 854.

■ Legislative control over waiving immunity from suit does not mean that the State can freely breach contracts with private parties or that the State can use sovereign immunity as a shield to avoid paying for benefits the State accepts under a contract. *Id.* . Rather, if a party who contracts with the State feels aggrieved, it can seek redress by asking the Legislature to waive immunity from suit. *Id.; see* TEX. CIV. PRAC. & REM.CODE ANN. §§ 107.001–.005 (Vernon 2005).

■ When the State contracts with a private party, it waives immunity from liability. *Little-Tex*, 39 S.W.3d at 594. The State does not, however, waive immunity from suit simply by contracting with a private party. *Id.* Immunity from suit bars a suit against the State unless the State expressly gives its consent to the suit. *Id.; see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.025; 107.001–.005. Although the claim asserted may be one on which the State acknowledges liability, this rule precludes a remedy until the Legislature consents to suit. *See Mo. Pac. R.R.*, 453 S.W.2d at 813. Legislative consent for suit or any other sovereign immunity waiver must be "by clear and unambiguous language." *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex.1994); *Duhart v. State*, 610 S.W.2d 740, 742 (Tex.1980).

■ Immunity from *liability* protects the State from judgments even if the Legislature has expressly given consent to the suit. *Mo. Pac. R.R.*, 453 S.W.2d at 813. Even if the Legislature authorizes suit against the State, the question remains whether the claim is one for which the State acknowledges liability. *See State v. Isbell*, 127 Tex. 399, 94 S.W.2d 423, 425 (1936). The State neither creates nor admits liability by granting permission to be sued. TEX. CIV. PRAC. & REM.CODE ANN. § 107.002 ("A resolution granting permission to sue does not waive to any extent immunity from liability."); *Isbell*, 94

S.W.2d at 424–25. However, when the State contracts, the State is liable on contracts made for its benefit as if it were a private person. *State v. Elliott*, 212 S.W. 695, 697–98 (Tex.Civ.App.-Galveston 1919, writ ref'd). Consequently, when the State contracts with private citizens, it waives immunity from liability.

## B. Plea to the Jurisdiction

A plaintiff who sues the State must establish the State's consent to sue. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999). Otherwise, sovereign immunity from suit defeats a trial court's subject-matter jurisdiction. *Id.* The State may assert sovereign immunity from suit in a plea to the jurisdiction. *Id.* A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction, thus defeating "a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000). Subject-matter jurisdiction is essential to the authority of a court to decide a case. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998).

In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's subject-matter jurisdiction by alleging a valid waiver of immunity. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex.2003). To determine whether the plaintiff has met that burden, we consider the facts alleged by the plaintiff and, to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties. *Id.* (quoting *White*, 46 S.W.3d at 868). "[I]f the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend." *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002). A plea to the jurisdiction must be denied where the State contends that it is immune on the basis of a "contract dispute" but where fact issues exist regarding the existence of a contract. *State v. Holland*, 161 S.W.3d 227, 233 (Tex. App.-Corpus Christi 2005, pet. filed). Because immunity from suit defeats a trial court's subject-matter jurisdiction, immunity from suit may properly be asserted in a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex.2004).

We review a trial court's ruling on a jurisdictional plea de novo, construing the pleadings in the plaintiff's favor and looking to the pleader's intent. *Id.* at 226; *IT–Davy*, 74 S.W.3d at 855. Whether the pleader has alleged facts that affirmatively demonstrate subject-matter jurisdiction is a legal question that we review de novo. *Miranda*, 133 S.W.3d at 226. "If a plea to the jurisdiction challenges the existence of jurisdictional facts, [a court is to] consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* at 227. Yet, "[i]f the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issues will be resolved by the fact finder." *Id.* at 227–28.

## C. Declaratory Judgment Act

The Uniform Declaratory Judgment Act ("DJA") is a remedial statute designed "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (Vernon 1997); *IT–Davy*, 74 S.W.3d at 855. The Act provides:

A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, con-

tract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a) (Vernon 1997). The DJA does not extend a trial court's jurisdiction, and a litigant's request for declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature. *IT–Davy,* 74 S.W.3d at 855.

 Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority, but such suits are not "suits against the State." *Id.* (quoting *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 840 (1958)). This is because suits to compel state officers to act within their official capacity do not attempt to subject the State to liability. *Id.* In contrast, declaratory-judgment suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State. *Id.* That is because such suits attempt to control state action by imposing liability on the State. *Id.* at 856. Consequently, such suits cannot be maintained without legislative permission. *Id.; see also Fed. Sign,* 951 S.W.2d at 404. Private parties cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages, such as a contract dispute, as a declaratory-judgment claim. *IT–Davy,* 74 S.W.3d at 856; *Freedman v. Univ. of Houston,* 110 S.W.3d 504, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

## D. Inverse Condemnation and Federal Takings Clause

 The Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V.[11] The Texas Constitution provides that, "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." TEX. CONST. art. I, § 17. Although sovereign immunity generally protects the State from lawsuits for monetary damages, it offers no shield against a taking claim brought under article 1, section 17 of the Texas Constitution. *Steele v. City of Houston,* 603 S.W.2d 786, 791 (Tex.1980); *see also Little–Tex,* 39 S.W.3d at 594.

 To have standing to sue for inverse condemnation, a party must have a property interest at the time of the alleged taking. *City of Keller v. Wilson,* 168 S.W.3d 802, 808 (Tex.2005); *City of Houston v. Boyle,* 148 S.W.3d 171, 178 (Tex. App.-Houston [1st Dist.] 2004, no pet.). Not any property interest will do; that interest must have risen to the level of a vested right. *State/Operating Contractors ABS Emissions, Inc. v. Operating Contractors/State,* 985 S.W.2d 646, 651 (Tex. App.-Austin 1999, pet. denied). A *vested property right* is one that has been fixed by a court's final judgment or that has some definitive, rather than merely potential, existence. *Reiss v. Reiss,* 40 S.W.3d 605, 608 (Tex.App.-Houston [1st Dist.] 2001), *rev'd on other grounds,* 118 S.W.3d 439 (Tex.2003). Standing is a constitutional prerequisite to maintaining suit. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.,*

---

**11.** There is some question whether State Street and Viron alleged federal claims as well as their state claims for inverse condemnation. We read their pleadings to assert a claim for federal "takings" and will accordingly address both the alleged federal and state constitutional violations.

852 S.W.2d 440, 444 (Tex.1993); *Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984).

■ The State does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute. *Little–Tex,* 39 S.W.3d at 598–99. Rather, the State is acting within a color of right under the contract and not under its eminent domain powers. *Id.* at 599.

To recover damages for inverse condemnation, State Street and Viron had to prove that TSU intentionally took or damaged the equipment for public use, or were substantially certain that would be the result. *See* Tex. Const. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004). To defeat TSU's plea to the jurisdiction, however, State Street need only plead sufficient facts to show the elements of an inverse-condemnation cause of action. *See Kerr v. Tex. Dep't of Transp.,* 45 S.W.3d 248, 251 n. 3 (Tex. App.-Houston [1st Dist.] 2001, no pet.).

## III. ANALYSIS

TSU argues that, as a political subdivision of the State, it enjoys immunity from Viron's and State Street's suits absent legislative consent. *See Fed. Sign,* 951 S.W.2d at 408. In response, Viron offers three theories to support its contention that TSU waived its sovereign immunity from suit. Specifically, Viron asserts that TSU's immunity from suit was waived by: (1) TSU's accepting full contractual benefits ("waiver by conduct"), (2) inverse condemnation, and (3) legislative consent in the Declaratory Judgment Act. Similarly, State Street offers two theories to support its contention that TSU waived its sovereign immunity from suit by: (1) inverse condemnation and (2) legislative consent in the Declaratory Judgment Act.

### A. Waiver by Conduct

In issue one, TSU argues that Viron has not obtained legislative permission to sue TSU. It questions if sovereign immunity defeats subject-matter jurisdiction over Viron's claims against TSU for breach of contract, unjust enrichment, indemnity, and a declaratory judgment with respect to the validity of the contract between Viron and TSU. In response, Viron argues that TSU has waived its sovereign immunity by its conduct.

### 1. Standing

■ TSU argues that, "because Viron admittedly assigned all of its rights under the Contract, . . . it lacks standing to sue TSU for breach of that Contract."

Viron does not claim ownership of the equipment. Viron validly assigned all its interest in the equipment in question to State Street Bank. Viron argues, however, that, because TSU refuses to acknowledge that State Street ever acquired any interest in the equipment by virtue of the assignment, Viron retains the breach of contract claim.

An oversimplification of the facts helps illuminate Viron's explanation of how it "retains a genuine and substantial stake in this litigation."

- Viron and TSU entered into a contract;
- TSU has accepted the benefit of millions of dollars worth of equipment under that contract;
- TSU has refused to pay the contracted price;
- Viron assigned its right to receive payments from TSU to State Street Bank, which financed the deal;
- State Street sued TSU for defaulting on its payments;
- State Street also sued Viron for breach of warranty and indemnity on the theory that Viron is financially liable for TSU's default;

- Viron sued TSU to protect itself from being forced to pay TSU's default;
- Viron faces a potential multi-million dollar loss in this case.

This three-way litigation is plainly a situation in which a real controversy exists between Viron and TSU which can be determined by monetary relief. Thus, it satisfies the constitutional minimum for standing. *See Texas Ass'n of Bus.*, 852 S.W.2d at 446 ("The general test for standing in Texas requires that there (a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought."). We hold that Viron has standing to asserts its contract claims. *See Miranda*, 133 S.W.3d at 227–28.

### 2. Supreme Court cases from *Federal Sign* to present

In the seminal case, *Federal Sign v. Texas Southern University*, the Supreme Court held that sovereign immunity bars breach-of-contract claims against the State unless the claimant has obtained legislative consent to sue. *Id.* In *Federal Sign*, a contract had been executed but it was terminated by TSU before performance. *Id.* at 403. Justice Baker's majority opinion cautioned that the holding was limited and observed that "[t]here may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts." *Id.* at 408 n. 1. Writing for a plurality of four justices, Justice Hecht concurred in *Federal Sign* and reinforced the significance of the narrow holding of the Court by stating that "today's decision does not hold that the State is always immune from suit for breach of contract absent legislative consent; it holds only that the mere execution of a contract for goods and services, without more, does not waive immunity from suit." *Id.* at 413 (Hecht, J., concurring). Justice Hecht posed a series of hypotheticals that might support a waiver of sovereign immunity:

- We do not address whether the State is immune from suit on debt obligations, such as bonds.
- Would the result be different if Federal Sign had already installed the scoreboards and TSU refused to pay the agreed price?
- Or if TSU had accepted the scoreboards, acknowledged that Federal Sign had fully complied with the contract, but refused to pay the agreed price?
- Or if TSU refused to pay in order to force Federal Sign to make a concession on another contract?

*Id.* at 412 (Hecht, J., concurring). Justice Hecht recognized that the *Federal Sign* opinion does "not attempt to decide such hypotheticals today." *Id.* (Hecht, J., concurring).

In 2001, the Texas Supreme Court revisited the issue in *General Services Commission v. Little–Tex Insulation Co.*, 39 S.W.3d 591 (Tex.2001). Justice Baker wrote for the majority that held that the State does not waive immunity merely by accepting benefits under a contract. *Id.* at 595–98. The *Little–Tex* case involved two companion cases. One case involved a construction dispute in which the construction had been completed, and the State, after paying the full contract price, refused to pay a claim for adjustments. *Id.* at 599. The second case involved an asbestos abatement contract that was terminated by the State, in the middle of performance, based on disputes regarding the contractor's performance. *Id.* at 594. Neither case involved a situation in which a contract had been fully performed and the State refused to pay anything. In fact, neither of the cases addressed any of the hypotheticals previously raised in Justice Hecht's concurrence to *Federal Sign*. Af-

ter determining that the cases fell within the newly-enacted administrative procedure found in Chapter 2260 of the Government Code,[12] the court concluded that "there is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature." *Id.* at 597. Here, however, the trial court determined, and we agree, that Chapter 2260 does not apply in this case.

The next year, the Texas Supreme Court again addressed the waiver-by-conduct exception to sovereign immunity in *Texas Natural Resource Conservation Commission v. IT–Davy,* 74 S.W.3d 849 (Tex.2002), and it was divided 4–4 on the issue with one dissenting justice (Justice Enoch). In *IT–Davy,* the State had paid a contractor the full contract price under the original terms, but it paid only a small percentage of a claim for additional expenses and lost profits asserted under an "equitable adjustment" clause. *Id.* at 851. Eight justices agreed that the facts did not support a waiver-by-conduct exception, but were divided on the reasoning. Justice Baker authored a plurality opinion urging a bright-line approach barring a waiver-by-conduct exception under any circumstances. *Id.* at 857. Justice Hecht authored a concurrence for a plurality of four justices explaining why the facts in *IT–Davy* did not rise to the level anticipated in his *Federal Sign* hypotheticals. *Id.* at 860–62. He wrote, "My hypothetical supposed a government agency that chiseled a contractor just because it could get away with doing so. Here, TNRCC and IT–Davy have a legitimate disagreement over what price should be paid for the extra work.... This is nothing more than an ordinary contract dispute." *Id.* at 861. The plurality concurrence also stated that "I cannot join, however, in the broad language of Justice Baker's opinion that indicates that the State is always immune

from suit for breach of contract absent legislative consent." *Id.* at 860. Justice Hecht concluded by stating that "I cannot absolutely foreclose the possibility that the State may waive immunity in some circumstances other than by statute." *Id.* at 862.

In *Travis County v. Pelzel & Associates,* 77 S.W.3d 246 (Tex.2002), the Supreme Court rejected another waiver-by-conduct assertion in a case involving a construction contract. After the building was completed, Travis County paid virtually the entire contract price of $414,164.80, but withheld $5,500 because the performance was not timely, relying on a liquidated damages clause. *Id.* at 247. The court found no waiver of immunity because the conduct at issue in that case did not amount to a waiver. *Id.* at 252. The court held that "[w]hen a governmental unit adjusts a contract price according to the contract's express terms, it does not, by its conduct, waive immunity from suit, even if the propriety of that adjustment is disputed." *Id.* Viron contends that this holding illustrates the Texas Supreme Court's desire to impute a more "modest, case-by-case approach" when considering waiver-by-conduct.

In *Texas A & M University–Kingsville v. Lawson,* Justice Hecht, writing for a 5–4 Court, adopted a waiver exception for immunity in breach-of-contract cases: When the State settles a claim from which it is not immune, sovereign immunity does not protect it from a breach-of-contract action to enforce the settlement agreement. 87 S.W.3d at 518. Lawson settled his Whistleblower Act case against the University, but later sued the University alleging that it violated the terms of the settlement. *Id.* at 519. The court recognized that "a suit for breach of a settlement agreement is separate and apart from the suit on the settled claim" and held that "enforcement of a settlement of a liability for which

12. Tex. Gov't Code Ann. §§ 2260.001 – 2260.006 (Vernon 2000).

immunity is waived should not be barred by immunity." *Id.* at 521. In so holding, the court rejected both the court of appeals' "adoption of a broad waiver-by-conduct exception to sovereign immunity" and Justice Rodriguez's dissent's "rigid view of immunity from suit for breach of contract." *Id.* at 522–23.

The Court's latest decision on the subject can be found in *Catalina Development, Inc. v. County of El Paso,* 121 S.W.3d 704, 704 (Tex.2003), where a county solicited bids for purchasing a parcel of land, accepted the highest bid, deposited the tendered earnest money, and sent the purported buyer a warranty deed and affidavit to be used to close the transaction. The county delayed authorization to sign the deed, and a newly-elected commissioner's court refused to approve the sale. *Id.* While repeatedly stating that the State may waive its immunity by conduct, the court held "the equitable basis for such a waiver simply does not exist under this set of facts." *Id.* at 705–06. The court distinguished the facts in *Catalina* from those in *Federal Sign* by stating that "the County did not profit unfairly at Collins's expense," and, despite the fact that he fully performed under the contract, Collins "ignores an important distinction between [Justice Hecht's hypothetical in his concurrence in] *Federal Sign* and this case. In *Federal Sign,* the State was the buyer of commercial goods, while here the County is the seller of government land. Collins does not seek to recover for goods already conveyed." *Id.* at 706. The *Catalina* court, which consisted of eight justices and one dissenter (Justice Enoch), clearly establishes that the court will evaluate the waiver-by-conduct exception to sovereign immunity on the facts of each case, not as a categorical matter or bright-line rule.

### 3. Application to our facts

■ The Texas Supreme Court has never addressed a waiver-by-conduct ex-ception argument faced with the "extraordinary factual circumstances" as the trial court described them here. In its order denying TSU's plea to the jurisdiction against Viron, the trial court listed the following eight "relevant factual allegations":

1. On January 16, 1998, TSU notified [Viron] by letter that the TSU Board of Regents had authorized the award of a contract to [Viron] for the performance of an audit of TSU's energy system (the "energy audit agreement"). The letter was signed by Dannette McElroy–Davis, project manager, and Harold Johnson, associate vice president of Facilities Planning and Operations for TSU.

2. On January 28, 1998, two TSU officials instructed [Viron] in a written "Notice to Proceed" to commence work on the audit.

3. On February 25, 1998, TSU General Counsel Cheryl Elliot Thornton ("Thornton") notified a TSU official that the energy audit agreement was "acceptable for final execution," subject to some technical revisions.

4. The energy audit agreement was executed by TSU President James M. Douglas ("Douglas") on or about March 4, 1998.

5. [Viron] completed the energy audit in June 1998.

6. As a result of the audit's findings, [Viron] submitted a proposal to TSU in which [Viron] offered to commence work on six projects aimed at improving energy conservation and efficiency on the TSU campus. The proposal, titled the Performance Based Energy Savings agreement (the "PBES agreement"), called for [Viron] to provide both services and equipment to TSU.

7. At a meeting on July 10, 1998, the TSU Board of Regents authorized the TSU administration to proceed with the PBES agreement. President Douglas subsequently executed the PBES agreement on behalf of TSU on July 27, 1998.

8. Pursuant to the PBES agreement, [Viron] and TSU entered into a Master State and Municipal Lease/Purchase Agreement (the "Master Lease") [footnote omitted] in September 1998 to finance the purchase of equipment needed to complete the energy projects. In a letter attached to the Master Lease, TSU General Counsel Thornton represented to [Viron] that the Master Lease was "duly authorized by all necessary action on the party of the Lessee (TSU)" and that the Master Lease was "legal, valid, and binding" and "enforceable in accordance with its terms."

Viron alleges that, after it provided approximately $13 million in equipment and services, TSU declared that the agreements in question were not valid obligations and refused to make payments due. Quintin Wiggins, TSU's corporate representative, testified that TSU did not make any lease payments on the equipment it received from the Master Lease. Viron contends that these facts alone are enough to create a waiver-by-conduct exception. It argues, however, that

the injustice is even worse, because this case also includes an additional fact that appears in none of the prior cases: The government officials lured Viron into the Master Lease with false promises that the contract would be valid and enforce-

able, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all.

We agree. Based on the facts before us, we overrule point of error one and hold that sovereign immunity does not defeat the trial court's subject-matter jurisdiction over Viron's claims for breach of contract.

## B. Waiver by the DJA

█ In issue three, TSU contends that the DJA does not expand courts' jurisdiction, and the declaration that State Street seeks concerns the validity of a contract with the State. TSU questions whether the trial court lacks jurisdiction to make this declaration.

State Street sought the trial court's determination and declaration that (1) the purported Master Lease and all related documents "were executed without the requisite authority" and are "void and unenforceable against TSU"; (2) TSU does not have any rights to the equipment; (3) State Street holds all rights, title and interest to the equipment; (4) TSU has "no right, title, or interest to the equipment and must return the equipment to State Street"; and (5) State Street is entitled to a constructive trust and return of the equipment to State Street. State Street's declaratory judgment action against TSU affirmatively pleads that its dispute with TSU is not based on a contract. State Street argues that TSU cannot contest its ownership because TSU failed to controvert ownership by verified denial as required by Texas Rule of Civil Procedure 93, which states that a pleading that a "plaintiff is not entitled to recover in the capacity in which he sues" is required to "be verified by affidavit." TEX.R. CIV. P. 93(2).[13] State Street further contends that TSU cannot contest State Street's allega-

---

**13.** Texas Rule of Civil Procedure 93(2) provides that "[a] pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be verified by affidavit.... 2. That the plaintiff is not entitled to recover in the capacity in which he sues...." TEX.R. CIV. P. 93(2).

tion that there is no contract between the parties because TSU failed to controvert, by verified denial as required by rule 93, State Street's express pleading that the Master Lease was void *ab initio*.[14]

TSU argues that *IT–Davy* conclusively bars Viron's declaratory-judgment claim, which requests a declaration that the contract is valid and State Street's declaratory judgment claim, which seeks a declaration that the contract is "void and unenforceable."

The Texas Supreme Court has identified only two types of declaratory-judgment claims that a plaintiff may assert against the State; a plaintiff may seek either (1) to compel a state officer to act within his official capacity or (2) to establish a contract's validity, enforce performance under a contract, or impose contractual liabilities. *IT–Davy*, 74 S.W.3d at 855. The first category of claims are not "suits against the State." *W.D. Haden Co. v. Dodgen*, 158 Tex. 74, 308 S.W.2d 838, 840 (1958). In contrast, the second category of claims are suits against the State "because such suits attempt to control state action by imposing liability on the State." *IT–Davy*, 74 S.W.3d at 856. Consequently, such suits cannot be maintained without legislative permission. *Id.*

Viron's and State Street's requests for declarations concerning the Master Lease's validity fall squarely within the second category of declaratory-judgment

claims identified in *IT–Davy* and thus fall outside the trial court's subject-matter jurisdiction. *See id.*

We sustain issue three.

## C. Waiver by Inverse Condemnation

In issue two, TSU asserts that, under established Texas law, a party cannot circumvent the State's immunity from suit by recasting a contract claim as one for inverse condemnation. Assuming that TSU obtained the equipment pursuant to a written contract, not through the exercise of eminent-domain powers, TSU asks us to decide if Viron can overcome TSU's sovereign immunity simply by pleading an inverse-condemnation claim. In issue four, TSU contends that, on the day of the assignment, Viron did not possess a vested property right in the equipment, and the evidence establishes that TSU acquired the equipment pursuant to its contract with Viron, not through the exercise of eminent-domain powers. TSU questions whether either of these facts suffice to deprive the trial court of jurisdiction over State Street's inverse-condemnation and federal takings clause claims.

Both State Street and Viron alleged inverse condemnation and takings in their pleadings. State Street asserts no contract claim against TSU and seeks no recovery under the allegedly void Master Lease. Rather, State Street asserts that it is the owner of the equipment by virtue

---

14. We do not find State Street's rule 93 argument persuasive. When capacity is contested, rule 93 requires that a verified plea be filed unless the truth of the matter appears of record. Tex.R. Civ. P. 93; *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 56 (Tex.2003). "Capacity has been defined as a party's personal right to come into court and should not be confused with the question of whether a party has an enforceable right or interest." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005) (quoting 6A WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND

PROCEDURE: CIVIL 2D § 1559, at 441 (2d ed.1990)). Furthermore, a trial court has no discretion to refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice or (2) the amendment is objected to and asserts a new cause of action or defense and is thus prejudicial on its face. TEX.R. CIV. P. 66; *Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co.*, 844 S.W.2d 664, 665 (Tex.1992); *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 91 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

of two assignments: the Viron/Academic Assignment and the Academic/State Street Assignment.

### 1. Standing

TSU argues that State Street lacks standing based on correspondence it sent to TSU. On September 14, 2001, State Street sent a letter to the President of TSU, Priscilla Slade,[15] and the former President, Harold Johnson, notifying them of TSU's default under the Master Lease. State Street stated that, without waiving its rights under the Master Lease, it was deferring "the re-vesting and reverting of title to the equipment in [State Street] until such time as we have notified you of same. It should be further noted that the unpaid Rental Payments payable continue to accrue interest in the manner provided for late payments ... of the [Master] Lease."[16] TSU contends that "this letter speaks for itself—both as to State Street's acknowledgment of the Contract's existence ... and to State Street's lack of title to the equipment."

State Street argues that, through the assignment, it paid $8.5 million "for the equipment." TSU responds, however, that State Street's payment was not "for the equipment," but rather for "an array of rights that notably failed to include any vested property right in the equipment."

With respect to Viron, TSU contends that Viron lacks standing to assert an inverse condemnation claim because it assigned away any right it may have had in the equipment. Viron concedes that it "does not claim ownership of the equipment. Viron validly assigned all its interest in the equipment in question to State Street Bank so the inverse condemnation claim belongs to State Street Bank." Viron argues, however, that, because TSU refuses to acknowledge that State Street ever acquired any interest in the equipment by virtue of the assignment, Viron retains the property interest and the inverse condemnation claim.

We hold that the evidence creates a fact question regarding the standing jurisdictional issue thus requiring us to resolve the issue in favor of Viron and State Street. See IT–Davy, 74 S.W.3d at 855; see also Miranda, 133 S.W.3d at 227–28.

### 2. Color of Contract

■ TSU contends that, even if Viron and State Street had standing to pursue their takings claims, the trial court still lacked jurisdiction because TSU acquired the equipment under color of contractual right and thus without any intent to exercise eminent—domain power.

In its third amended petition, State Street alleged, in relevant part:

In exercising dominion over and use of the equipment, TSU intentionally denied State Street its property and applied it for public use.

The past and continuing use of State Street's equipment is a physical act that constitutes a taking of property and an unreasonable interference with State Street's exclusive right to use and enjoy the property in violation of the Texas and United States constitutions.

This intentional act was done without process or a proper condemnation proceeding.

TSU has expressly denied it has any title to the equipment. Further, it has acknowledged that it is not bound by any contract conferring right to the equipment.[17] Therefore, the university

---

15. Slade was terminated from her position as president on July 17, 2006.

16. TSU's Board of Regents, the Assistant Attorney General of Texas, and TSU's interim general counsel were copied on the letter.

17. These statements are derived from Wig-

is exercising eminent domain powers. Conversely, TSU's withholding of State Street's property is not the result of a contract dispute because the sworn testimony of its designated representative concedes that there are no enforceable contracts that regulate, control, or affect its right in these matters.

State Street seeks to recover just and adequate compensation from TSU for the past and continuing taking of its property.

State Street was not required to prove these allegations at this stage of the lawsuit; all that was required to defeat TSU's plea to the jurisdiction was a pleading of facts showing the elements of an inverse-condemnation cause of action. *See Kerr,* 45 S.W.3d at 251 n. 3. State Street contends that it has satisfied its obligations because it has alleged that (1) there is no contract, (2) it owns the equipment, (3) its assignment is valid, and (4) TSU's taking of the equipment was intentional.

In its second amended counterclaim and third-party petition, Viron alleged the following with respect to its inverse-condemnation claim:

> By virtue of the assignment of the Master Lease, State Street Bank acquired certain property rights in some of the equipment that was installed by Viron on the TSU campus. Specifically, State Street Bank acquired rights in equipment other than the equipment relating to the Main Thermal Plant upgrade, which was not financed under the Master Lease and for which TSU paid cash. By exercising dominion and control over such other equipment, for which it has not paid, TSU has intentionally denied State Street Bank its rights in such property. Such action by TSU constitutes a taking of property without due

process of a proper condemnation proceeding.

It is clear that the equipment was delivered to TSU, and its possession of the equipment was by virtue of the Master Lease and not by virtue of a taking within the meaning of article I, section 17 of the Texas Constitution. TEX. CONST. art. I, § 17. Viron voluntarily and with its own consent delivered the equipment to TSU after making the Master Lease. In so doing, Viron cannot now say that the equipment was taken under the power of eminent domain. *See State v. Steck Co.,* 236 S.W.2d 866, 869 (Tex.Civ.App.-Austin 1951, writ ref'd) (holding that unenforcible contract precludes legal liability and no constitutional violation).

We hold that State Street's and Viron's pleadings and evidence fail to allege sufficient facts to establish TSU's requisite intent under constitutional-takings jurisprudence. *See Little–Tex,* 39 S.W.3d at 598–99.

We sustain issues two and four.

### Conclusion

We affirm the trial court's orders denying TSU's pleas to the jurisdiction with respect to Viron's contract claims and reverse the trial court's denial of TSU's pleas to the jurisdiction relating to Viron's and State Street's inverse-condemnation and declaratory judgment claims.

Justice KEYES, concurring and dissenting.

EVELYN V. KEYES, Justice, concurring and dissenting.

I withdraw my concurring and dissenting opinion issued June 8, 2006 and substitute this opinion in its stead. To the ex-

---

gins's deposition. TSU responds that Wiggins's testimony is not binding and simply

represents a "subsequently adopted litigation position."

tent this case may be properly construed as a breach of contract action on a valid contract, I join the opinion of the Court and urge the Supreme Court of Texas to adopt the waiver-by-conduct exception to sovereign immunity from suit adopted by most other states. *See Federal Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 419–20 (Tex.1997) (Enoch, J., dissenting). However, I do not think it is necessary to reach the issue of waiver of sovereign immunity because I believe that appellees CMS Viron Corporation and CMS Energy Resource Management Company (collectively "Viron") and State Street Bank and Trust Company ("State Street") have properly pleaded an inverse condemnation claim against appellant Texas Southern University ("TSU"), to which there is no sovereign immunity, and that this case should be decided as an inverse condemnation case. Therefore, I dissent from the majority's holding that State Street and Viron have not properly pleaded an inverse condemnation claim, and I concur in the judgment reversing and remanding this case.

### Law of Inverse Condemnation

Sovereign immunity consists of two principal doctrines: immunity from liability and immunity from suit. *Federal Sign*, 951 S.W.2d at 405; *Texas Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 149 (Tex.App.-Austin 1998, no pet.). When a state agency, like TSU, enters a contract, it waives its immunity from liability, but not from suit. *Federal Sign*, 951 S.W.2d at 405–06; *Callaway*, 971 S.W.2d at 149. However, while sovereign immunity generally protects the State from lawsuits for monetary damages, it "offers no shield against a taking claim brought under Article I, section 17 of the Texas Constitution."

*Kenedy Mem'l Found. v. Mauro*, 921 S.W.2d 278, 282 (Tex.App.-Corpus Christi 1995, pet. denied); *see also General Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001) (sovereign immunity does not shield State from action for compensation under takings clause).[1] Rather, "[t]he Constitution itself is ... a waiver of governmental immunity for the taking, damaging or destruction of property for public use." *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex.1980); *see also Callaway*, 971 S.W.2d at 149 (action for inverse condemnation is exception to doctrine of sovereign immunity). Thus, to the extent this is properly construed as a takings case, the doctrine of sovereign immunity does not apply.

The State in its exercise of sovereign power has the unquestioned right to take private property for a public use. *State v. Hale*, 136 Tex. 29, 146 S.W.2d 731, 736 (1941). However, the takings clause prohibits the State from taking a person's property under its sovereign powers without adequate compensation. *Little–Tex*, 39 S.W.3d at 598; *see also Hale*, 146 S.W.2d at 736 (takings power is subject to right of owner to adequate compensation for taking of property). The language of the takings clause, article I, section 17 of the Constitution, has no exceptions or limitations attached; rather, "[i]t is a clear, definite statement of the rule which prevails in this State, which controls all the departments of the State government." *Hale*, 146 S.W.2d at 736. Ordinarily, a state agency compensates a property owner before taking his property, either by paying an agreed value or by paying the value determined in a formal condemnation proceeding. *Callaway*, 971 S.W.2d at

---

**1.** The Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Likewise, the Texas Constitution provides, "No person's property shall be taken, dam-aged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." Tex. Const. art. I, § 17.

148. Inverse condemnation occurs when the State or its agency physically takes or invades property or unreasonably interferes with the property owner's right to use and enjoy it. *Id.* "An 'inverse condemnation' proceeding is the avenue of relief available when property has been taken or damaged for public use without compensation or a proper condemnation proceeding, and the property owner wishes to recover compensation for his loss." *Id.*

To recover damages for inverse condemnation, the property owner must prove that a governmental entity intentionally took the owner's property for public use without paying adequate compensation or was substantially certain that such a taking would be the result of its intentional acts. *See* TEX. CONST. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004); *see also Little–Tex,* 39 S.W.3d at 598 (holding that, to establish takings claim, property owner must plead and prove State's intentional performance of certain acts resulted in taking of property for private use). To defeat a plea to the jurisdiction, however, the property owner need only plead sufficient facts to show the elements of an inverse-condemnation cause of action. *See Kerr v. Dep't of Transp.,* 45 S.W.3d 248, 251 n. 3 (Tex.App.-Houston [1st Dist.] 2001, no pet).

In determining the existence of jurisdiction, a court must "construe the pleadings in the plaintiff's favor and look to the pleader's intent." *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). The appellate court's task is not to decide the merits of the case, but to examine the claims in the pleadings, taking the facts pled to be true, and to determine whether those facts support jurisdiction in the trial court. *Osburn v. Denton County,* 124 S.W.3d 289, 292 (Tex.App.-Fort Worth 2004, pet. denied). The court may also consider relevant evidence submitted by the parties when necessary to resolve jurisdictional issues raised by the pleadings. *Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 227 (Tex.2004); *Harris County Flood Control Dist. v. Adam,* 56 S.W.3d 665, 667 n. 4 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd w.o.j.). "If the evidence creates a fact question regarding the jurisdictional issue, the trial court cannot grant the plea to the jurisdiction, and the fact issues will be resolved by the fact finder." *Miranda,* 133 S.W.3d at 227–28. "Whether particular facts are enough to constitute a taking is a question of law." *Little–Tex,* 39 S.W.3d at 598.

## Application of Law to Jurisdictional Facts

State Street alleges that TSU, a state agency, intentionally entered a contract to procure energy saving heating and cooling equipment from Viron's predecessor through fraudulent inducement and that TSU's intentional fraudulent representations resulted in TSU's taking the equipment for the use of the university, hence for a "public use," without compensation and that State Street, as assignee of Viron's property interest in the equipment, may, therefore, seek compensation for the equipment from TSU under the takings clause. Therefore, State Street's pleading, on its face, alleges an inverse condemnation claim against TSU. *See Jennings,* 142 S.W.3d at 313–14.

TSU contends, however, that under *Little–Tex,* it cannot have the requisite intent for constitutional-takings jurisprudence because it is withholding money from State Street pursuant to a contract dispute. *See id.* at 598–99. It contends that because it took the equipment pursuant to a contract, it was acting "within a color of right under the contract and not under its eminent domain powers." *Id.* at 599. State Street replies that no valid contract was formed

because TSU fraudulently induced the agreement with Viron, and, therefore, the contract between TSU and Viron is void and gives rise to no "colorable right" to the equipment on the part of TSU. I agree with State Street.

A contract must be based upon valid consideration, i.e., mutuality of obligation. *Federal Sign,* 951 S.W.2d at 408. A contract that lacks mutuality of obligation is "illusory and void," and thus unenforceable. *Id.* at 409. "Where the execution of a contract is procured by fraud, misrepresentation, or concealment, such that there is no real assent to the agreement, assent may be negated and the binding nature of the contract avoided." *Amouri v. Southwest Toyota, Inc.,* 20 S.W.3d 165, 169 (Tex. App.-Texarkana 2000, pet. denied).

Fraudulent inducement is a type of fraud claim that requires a showing that a false material misrepresentation was made that (1) was either known to be false when made or was asserted without knowledge of its truth or falsity, (2) was intended to be acted on, (3) was relied on, and (4) caused injury. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors,* 960 S.W.2d 41, 47 (Tex.1998); *Amouri,* 20 S.W.3d at 168–69. "As a rule, a party is not bound by a contract procured by fraud." *Formosa Plastics,* 960 S.W.2d at 46. Indeed, " 'the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it.' " *Id.* (quoting *Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551, 558 (1941)). Thus, a contract procured by fraud conveys no contractual rights. *See id.* However, the plaintiff must present evidence that the defendant "made representations with the intent to deceive and with no intention of performing as represented," and the evidence must be relevant to the defendant's intent at the time the representation was made. *Id.* at 48.

Here, State Street presented evidence that TSU signed a lease agreement (the "Lease") with Viron's predecessor under which TSU was to be lessee of approximately $8.5 million of heating and cooling equipment and Viron's predecessor, or its assignee, was to be the owner. Before the equipment was delivered, Viron assigned to State Street's predecessor in interest, by a written assignment, the title and ownership in the equipment and all moneys payable, or to become payable, with respect to the equipment. TSU acknowledged the assignment in writing. Consequently, State Street delivered $8,547,545.51 into an acquisition fund so that the equipment could be purchased.

State Street and Viron also presented evidence that, in order to induce Viron's predecessor to enter the Lease, TSU promised to pay rent in exchange for the equipment over a ten-year period, after which it would obtain an equity interest in the equipment and acquire title to it. TSU also specifically represented and warranted that it had "presented this Master Lease for approval and adoption as a valid obligation on its part and that all requirements have been met and procedures have been followed to ensure the enforceability of the Master Lease." In addition, it represented and warranted that it "ha[d] the legal capacity to enter into this Master Lease" and that its "obligation under this Master Lease constitutes an enforceable obligation."

Finally, Viron's predecessor demanded an "opinion of counsel" that TSU's promises were valid, and it received an opinion letter from TSU's general counsel representing that TSU had "the power and authority to enter into the Master Lease," that the execution of the Master Lease had been "duly authorized by all necessary actions," that the officer who signed the Lease was "duly authorized" to execute

the Lease and the attached documents, that the Lease "constitutes a legal, valid and binding deferred payment obligation of the Lessee, enforceable in accordance with its terms," and that "[t]his opinion may be relied upon by you and your assigns." These extraordinary assurances were required by Viron because of TSU's then recent success in avoiding its contractual obligations to Federal Sign on sovereign immunity grounds. *See Federal Sign*, 951 S.W.2d at 412.

TSU, however, failed to make any lease payments. Among its stated reasons was that TSU's associate vice president *did not have authority* to enter into the Lease and related documents. In other words, it contradicted its own written representation that it did have such authority, made in order to induce Viron's predecessor to deliver the equipment to it. Moreover, TSU's corporate representative, the University's Senior Vice President for Business and Finance, Quintin Wiggins, testified by deposition that the procedures to create a valid lease agreement had not been followed, so that the Lease was never valid and was unenforceable; the Lease was never authorized by the TSU Board of Regents of the Higher Education Coordinating Board; TSU was not the owner of the equipment, but merely a lessee; and State Street had title to the equipment. Wiggins, in his capacity as corporate representative, thus also contradicted TSU's express written representations that the execution of the Lease had been duly authorized by all necessary actions, that the Lease was valid and enforceable, and that the Lease could be relied upon by Viron's predecessor and its assigns. Wiggins acknowledged that TSU had never made any lease payments. Thus the only consideration given by TSU for the equipment it took was its own admittedly false promises.

Under the circumstances of this case, TSU's representations of fact—subsequently repudiated by its corporate representative under oath—can be construed in only two ways. First, they may have been intentionally false representations made to induce Viron and its assignees to finance and install over $8 million worth of heating and cooling equipment on the premises of TSU. If TSU's counsel's representations of law were based on its false representations of fact that proper procedures had been followed and that the proper persons with the proper authority had approved the lease, its representations of law were likewise false and could have been intended only to enable TSU to take Viron's and its assignees' property without compensation. Alternatively, the representations may have been true when made or made without knowledge of their truth or falsity, but made with the fraudulent intent to give TSU an exit strategy when called upon to pay for the equipment it had obtained. It could—as it did—falsely deny that the contract was authorized or that procedures had been followed, thereby denying the truth of its own representations and warranties and the validity of the contract while retaining the equipment it had procured on the basis of its "colorable right" under the very contract it repudiated on the basis of its own admitted falsehoods. Either way, TSU intentionally made false material misrepresentations to take and retain millions of dollars worth of energy saving equipment for the use of the university without compensating Viron, or its predecessor in interest, or its assignee, State Street.

I would hold, on the basis of the pleadings and the jurisdictional facts in the record, that the Lease between Viron and TSU lacked mutuality of obligation and was, therefore, illusory and void. *See Federal Sign*, 951 S.W.2d at 408–09. Thus, this is not a contract dispute and TSU has

no "colorable right" to the equipment. Rather, it knowingly made false representations to obtain and retain the equipment for its own use with the intention of not compensating the acknowledged owner, originally Viron's predecessor, now Viron's assignee, State Street. Thus, this is an inverse condemnation case, not a breach of contract case. Therefore, I would hold that State Street, as assignee of the property rights in the equipment, properly pleaded an inverse condemnation claim based on TSU's allegedly taking the equipment for the use of the university without compensation or with substantial certainty that that would be the result of its intentional acts. *See Jennings,* 142 S.W.3d at 313–14.

### Inverse Condemnation v. Contract Disputes with Sovereign Entities

This case is totally unlike those cases in which a state entity has successfully urged its sovereign immunity to claims based on a dispute arising from a valid contract. *Cf. Federal Sign,* 951 S.W.2d at 408–09 (consideration for valid contract existed in form of *mutual promises* where Federal Sign promised to build scoreboards in exchange for TSU's promise to pay; Federal Sign began building scoreboards; and TSU subsequently notified Federal Sign its bid was unacceptable and contracted with other manufacturers); *Smith v. Lutz,* 149 S.W.3d 752, 760–61(Tex.App.-Austin 2004, no pet.) (when university obtained possession of software from plaintiff by virtue of contract voluntarily entered and dispute arose over plaintiff's performance and university's payments, university was acting under color of contractual rights and did not have requisite intent for eminent domain); *Freedman v. Univ. of Houston,* 110 S.W.3d 504, 506, 509 (Tex. App.-Houston [1st Dist.] 2003, no pet.) (suit over terms of employment contracts with university constituted suit for breach

of contract, not for "taking" of property without compensation to owner); *State v. Steck Co.,* 236 S.W.2d 866, 869 (Tex.Civ. App.-Austin 1951, writ ref'd) ("Appellee by making the contract, manufacturing the stamps and delivering them to the State did so *voluntarily and with its own consent,* and can not now say the stamps were taken under the power of eminent domain.") (quoted in *Little–Tex,* 39 S.W.3d at 599).

Rather than resembling the foregoing cases—each of which evidenced a valid contract knowingly and voluntarily entered—this case closely resembles *Callaway,* an inverse condemnation case. In that case, the Texas Parks and Wildlife Department opened a canal over Callaway's property to public use in contravention of the terms of an easement. *See Callaway,* 971 S.W.2d at 147–48. Callaway sued the Department in inverse condemnation, contending that it had effectively taken his property without compensation. *Id.* The Department responded by recharacterizing Callaway's claim as a suit for breach of the easement agreement, i.e., as a suit to which it had sovereign immunity. *Id.* at 148. The Austin Court of Appeals expressly distinguished Callaway's inverse condemnation claims from mere breach of contract claims, stating that Callaway's claim did not rest on breach of contract alone but on the taking of his property without compensation, and that in each case in which it had held that sovereign immunity prevented a private party from recovering damages from the State for an alleged breach of contract, the State's duty to pay "arose *solely* from its contract with the private party." *Id.* at 150.

The *Callaway* court opined, "The existence of a contract is not talismanic, but merely leaves the state's immunity from suit intact; it does not build an impenetra-

ble wall nullifying the possibility of other waivers of and exceptions to that immunity." *Id.* The court observed that in taking Callaway's property, the Department had done more than merely breach a contract; it had acted affirmatively to open the property to public boating. *Id.* at 150–51. Thus the issue was whether the Department had taken or damaged Callaway's property by its affirmative acts *aside* from withholding performance of its contractual obligations. *Id.* Disregarding the easement agreement, the court was left with Callaway's claim that the Department had intentionally performed certain acts that resulted in a taking or damaging of his property for public use, which acts gave rise to a lawful cause of action under article I, section 17 of the Texas Constitution, the takings clause. *Id.* at 150–51.

The same reasoning has been applied and the same result reached in other cases similar to the instant case and *Callaway.* In *Kenedy Memorial Foundation v. Mauro*, the Corpus Christi Court of Appeals upheld a property owner's right to bring an inverse condemnation suit when the Commissioner of the General Land Office, having statutory authority to determine the boundary between State and private property, refused to recognize a change in the physical characteristics of land and in state law interpreting boundaries, and continued to grant mineral leases on a portion of the disputed property, to the State's benefit. 921 S.W.2d at 282; *State v. Holland*, 161 S.W.3d 227, 230, 232–33 (Tex. App.-Corpus Christi 2005, pet. granted) (holder of patent on polymer-based filters properly pled an inverse condemnation claim against State for using series of special polymer-based filters to remove pollution in violation of patent where State contended that it acted under color of right under implied-in-fact contract with Holland's companies, but there was little evidence of contract and State's witness acknowledged there was no contract).

More generally, the Supreme Court of Texas has held that an inverse condemnation suit for damages is a proper vehicle for recovery "when the government's action against an economic interest of an owner is for its own advantage." *City of Austin v. Teague*, 570 S.W.2d 389, 391–93 (Tex.1978) (upholding propriety of inverse condemnation suit by landowners when city used its regulatory police power to deny waterway development permit, causing landowners to lose all use of land, so that city by indirection acquired at no cost scenic easement which it had recommended State Highway Department acquire by purchase); *see also State v. Biggar*, 873 S.W.2d 11, 13–14 (Tex.1994) (finding inverse condemnation when landowners pled and proved that State intentionally caused expiration of site development plan and resulting decrease in value of tract by denying landowners' request for easement exchange, thus reducing amount required to pay for portion of tract being taken through eminent domain).

The Supreme Court in *Teague*, quoting this Court, opined, "The social desirability of leaving government free to seek its own enrichment at the expense of those whom it governs under the guise that it has the power to regulate harmful conduct is not readily apparent." *Teague*, 570 S.W.2d at 393–94 (quoting *Kirschke v. City of Houston*, 330 S.W.2d 629 (Tex.Civ.App.-Houston 1959, writ ref'd n.r.e.)). The social desirability of leaving government free to seek its own enrichment under the guise of "colorable rights" derived from an illusory contract is no more readily apparent than the governmental action condemned in *Teague* and *Biggar.*

### Conclusion

I would hold that State Street, having succeeded to Viron's rights against TSU, has properly pleaded an inverse condemnation case against TSU.

Since a state agency has no sovereign immunity to an inverse condemnation claim, I would affirm the trial court's denial of TSU's pleas to the jurisdiction relating to Viron's and State Street's inverse-condemnation claims and would remand this case to the trial court for trial.