**Opinion issued April 19, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00805-CV

———————————

**HARRIS COUNTY FRESH WATER SUPPLY DISTRICT NO. 61, Appellant**

**V.**

**MAGELLAN PIPELINE COMPANY, L.P. AND V-TEX LOGISTICS, LLC, Appellees**

---

**On Appeal from the County Civil Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 1118537**

---

# O P I N I O N

In this case, we must decide whether a governmental entity is immune from a suit to condemn a portion of its property for an easement through which to build a common-carrier pipeline. Appellees, Magellan Pipeline Company, L.P. and V-Tex Logistics, LLC (collectively, "the Pipeline"), filed a condemnation proceeding

against appellant, Harris County Fresh Water Supply District No. 61 ("the District"), seeking an easement for the purpose of installing a pipeline[1] underneath the District's property. After the administrative phase of the condemnation[2] proceeding concluded, the Special Commissioners awarded the District an additional $160,000 over amounts it had already been paid by the Pipeline. Unhappy with the award, the District filed a Plea to the Jurisdiction[3] and Objections to the Award of Special Commissioners, arguing that the award "fails to award the District adequate compensation for [Appellees'] acquisition of the Easements." After a partial summary judgment and a nine-day bench trial, the trial court entered a Final Judgment that granted the Pipeline a permanent easement, awarded the District the $160,000 additional compensation approved by the Special Commissioners, and denied all of the District's request for additional compensation. On appeal, the

---

[1] The pipeline has already been constructed and put into operation.

[2] In Texas, condemnation proceedings are conducted in two phases—an administrative phase, and, if necessary, a judicial phase. *City of Tyler v. Beck*, 196 S.W.3d 784, 786 (Tex. 2006) (per curiam). A proceeding is administrative in nature from the filing of the condemnation petition through the entry of an award of compensation by the court-appointed Special Commissioners. *Id.* Any party dissatisfied with that award may file an objection, which begins the judicial phase of the proceeding. *Id.*

[3] We note that the Plea to the Jurisdiction was not based on the doctrine of governmental immunity but argued that the condemnation was not authorized because (1) it would destroy the public use for which the property was already dedicated, and (2) that the Pipeline was not a common-carrier pipeline and did not serve a public purpose or use.

District argues for the first time that the condemnation suit should be dismissed because the District has governmental immunity. Alternatively, the District contends that the condemnation suit should be dismissed because the Pipeline did not prove that it had the required condemnation power. We affirm.

## I. BACKGROUND

### A. *The Pipeline Project*

Magellan Pipeline Company, LP and V-Tex Logistics, LLC are pipeline companies, and each owns its own pipeline system. Third-party shippers pay a fee to transport their products to destinations on their pipeline systems.

Magellan and V-Tex entered an agreement to develop a pipeline from east Houston to Hearne in Robertson County. The pipeline transports gasoline, diesel fuel, jet fuel, and other refined petroleum products for third parties. To complete the construction, the Pipeline needed to acquire easement rights across approximately 600 parcels of land owned by approximately 300 landowners. One of these parcels was a 30-acre tract of land owned by the District.

The District is a special purpose district under Article XVI, Section 59 of the Texas Constitution, and a fresh water supply district and municipal utility district under Chapters 49, 53, and 54 of the Texas Water Code. *See, e.g*., TEX. WATER CODE § 54.011. Among other activities, the District conserves, transports, and distributes water for domestic and commercial purposes, *id.* § 53.101, and controls,

3

stores, preserves, and distributes storm water and flood water. *Id.* § 54.012. One of the stormwater-detention ponds that the District operates is the Hendricks detention pond, which is located on the property through which the Pipeline sought an easement.

### B. The Parties Negotiate the Sale of an Easement

In late 2017, the Pipeline advised the District of the pipeline project and the two parties began negotiating for the transfer of an easement. Unable to reach an agreement on the terms of the transfer, counsel for the Pipeline and counsel for the District began discussing how to advance the process in the late summer of 2018.

One of the ideas that the parties' counsel discussed was the payment of an initial sum to the District by the Pipeline, with a condemnation proceeding to resolve the District's right to further compensation over and above the initial payment.

In furtherance of this idea, the Pipeline's counsel summarized his understanding of the proposed agreement in a September 3, 2018 email to the District's counsel, which provided as follows:

> **Condemnation**. Based on our last discussion, we understand that it is the District's preference that Magellan/V-Tex initiate a condemnation proceeding to assure there is a process by which the District can pursue the scheduling of a Special Commissioners hearing following the parties' execution of a right of entry agreement. We are preparing the proceeding for filing.

The District's counsel responded in a September 4, 2018 email, stating, "Very good. Thank you."

The email exchange also discussed that the parties would enter a right-of-entry agreement. Pursuant to this proposed agreement, the Pipeline would pay an initial payment if the District (1) granted a right of entry and (2) did not dispute the Pipeline's right to acquire the easement.

## C. The Pipeline Files This Condemnation Proceeding

As contemplated by the parties' September emails, on October 1, 2018, the Pipeline filed its Petition and Statement in Condemnation, which was assigned to County Civil Court at Law No. 3.[4] In an amended petition, the Pipeline stated that the acquisition of the easement rights was a public necessity and necessary for the construction of a common-carrier pipeline, and that it intended to exercise its eminent domain powers to acquire such easement. A November 21, 2018 First Amended Petition and Statement in Condemnation modified the description to include an additional easement across District-owned land.

## D. The Right-Of-Entry Agreements

On December 12, 2018, the parties executed an agreement entitled "Right of Entry and Possession," which stated that the parties "have agreed on terms for a partial settlement of the acquisition of the Easements." In the contract, the parties provided that:

---

[4]     No Original Petition and Statement in Condemnation is included in the clerk's record, but other documents in the clerk's record indicate that the Pipeline filed it on October 1, 2018.

> [T]he District does hereby GRANT and CONVEY unto [the Pipeline] the right to enter into possession of the Easements and proceed with the full exercise of the rights described in the Amended Petition, including the construction of the Pipeline and the possession and use of the portions of the Property subject to the Easements, consistent with and subject to the terms set forth in the Amended Petition and this Agreement.

Regarding compensation for the right of entry, the agreement provided:

1. In conjunction with the execution of this Agreement, [the Pipeline] shall pay to the District initial compensation of $493,287.50. In addition to such sum, [the Pipeline] also shall pay to the District additional compensation for the acquisition of the Easements, as follows:

   a. To the extent that the acquisition of the easement rights set forth in the Amended Petition (as may be modified by subsequent filing or agreement), the associated authority to exercise such rights, or the construction of the Pipeline requires the District to adjust the location of, encase, or otherwise modify its existing or currently planned facilities, the District will be entitled to pursue recovery of the costs of any such adjustments, encasements, or modifications; and

   b. [The Pipeline] will pay up to $25,000 for the engineering and legal fees the District is incurring in connection with the District's evaluation and negotiations relating to the Easements and the acquisition thereof.

   The compensation paid and to be paid pursuant to this paragraph 1 shall be the total compensation due to the District for [the Pipeline's] acquisition of the Easements.

The contract also provided this paragraph about the parties' intentions regarding the condemnation proceeding in the trial court:

3. In the [condemnation] Proceeding:

> a. The District will not contest (i) [the Pipeline's] authority to acquire the Easements and (ii) [the Pipeline's] compliance with the bona fide offer requirement in Chapter 21 of the Texas Property Code; and
>
> b. The District will be entitled to pursue recovery of the additional compensation described in paragraph 1.a. above.
>
> Consistent with the foregoing, the sole purpose of the [condemnation] Proceeding shall be to ensure that the District has a means for pursuing recovery of the costs, if any, encompassed by paragraph 1.a. above in the event the parties are unable to reach an agreement on the amount of such costs, if any. The date of taking for purposes of determining such additional compensation, if any, shall be the Effective Date of this Agreement.

The contract also provided a method for terminating the condemnation proceeding if the parties reached an agreement regarding (1) the amount of compensation and (2) the requirement that the District's engineer "reasonably cooperate" with the Pipeline's engineer:

> 4. In the event the parties are able to resolve the issues that are the subject of numbered paragraphs 1 [regarding additional compensation] and 2 [regarding reasonable cooperation] above in a mutually satisfactory way, they shall proceed with the execution of an easement and dismissal of the [condemnation] Proceeding, with each party to bear its own attorneys' fees and costs of court[.]

Finally, the contract contemplated the participation of both parties in the administrative portion of the condemnation proceeding, stating as follows:

7

13.	Counsel for the District and [the Pipeline] shall agree in writing on a date on which to conduct the Special Commissioners hearing[.]

On March 28, 2019, the parties executed the First Amendment of Right of Entry and Possession, which adjusted the route of the pipeline and required the Pipeline to pay the District an additional $20,937.50 as "compensation for the additional length of [the Pipeline's] easement resulting from the adjustment in the route of the Pipeline."

## F. The Administrative Proceeding

As required by law, the trial court appointed three Special Commissioners to conduct the administrative portion of the condemnation proceeding. *See* TEX. PROP. CODE § 21.014. Both parties, as required by the Right-of-Entry agreement,[5] agreed to a November 1, 2019 hearing date, and on that date, both parties appeared for the hearing with counsel.

In a memo to the Special Commissioners, the District described the scope of the proceedings to the Commissioners as follows:

> [T]he parties to a condemnation proceeding are permitted to settle all or a part of the dispute through a contractual settlement. *See, e.g., City of Carollton v. Singer*, 232 S.W.3d 790, 799–800 (Tex. App.—Fort Worth 2007, pet. denied). Here, [the Pipeline] and the District did just that — pursuant to a Right of Entry Agreement, [the Pipeline] agreed to settle on the value of the dirt, *leaving only the cost to the District for the required modifications to its facilities in dispute*. (Emphasis added).

---

[5]	Collectively, we refer to the Right of Entry and Possession and the First Amendment of Right of Entry and Possession as the "Right-of-Entry agreement."

8

On November 19, 2019, the panel entered an Award of Special Commissioners that provided in relevant part:

> Prior to convening of the hearing of the parties [the Pipeline] and [the District] settled and resolved certain issues regarding the compensation due for the acquisition of the Easements, such agreements being memorialized in a Right of Entry and Possession and First Amendment of Right of Entry and Possession. Pursuant to those agreements, [the District] has already been paid $514,225 as just compensation for the Easements. Such agreements permit [the District] to pursue recovery of additional compensation subject to the terms, conditions, and limitations set forth therein, and [the Pipeline] and [the District] have now presented evidence and argument regarding the additional compensation, if any, that is due.
>
> After consideration, we assess the additional compensation, if any, due [the District] for the acquisition of the Easements to be the total sum of $160,000.00.

## G. The Judicial Proceeding

On November 19, 2019, the District commenced the judicial portion of the condemnation proceeding by filing its Plea to the Jurisdiction and Objections to the Award of Special Commissioners. *See City of Tyler v. Beck*, 196 S.W.3d 784, 786 (Tex. 2006) (per curiam) ("Upon the filing of objections, the award is vacated and the administrative proceeding converts into a judicial proceeding.").

The District's Plea to the Jurisdiction was not based on sovereign immunity.[6] Instead, the District argued that the condemnation proceeding should be dismissed

---

[6] The District's Seventh Amended Plea to the Jurisdiction, Objections to the Award of Special Commissioners, and Special Exceptions, its live pleading at the time of

9

because "the subject property is already devoted to an existing public use" and the Pipeline's "acquisition of the Easements would practically destroy that public use." (Hereinafter, the District's "paramount-public-purpose defense"). *See Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth.*, 258 S.W.3d 613, 616–17 (Tex. 2008) ("We have long held that condemnees may prevent a condemnation when the property is already devoted to another public use and the condemnee establishes that the new condemnation would practically destroy the use to which it has been devoted.") (internal quotations and citations omitted).

Subject to its Plea to the Jurisdiction, the District objected to the Award of Special Commissioners "because it fails to award the District adequate compensation for [the Pipeline's] acquisition of the Easements."

### H. Partial Summary Judgment for the Pipeline

The Pipeline filed two motions for partial summary judgment: Petitioners' Traditional and No-Evidence Motion for Partial Summary Judgment and Petitioners' Second Traditional and No-Evidence Motions for Partial Summary Judgment. The trial court heard the motions together and granted it in part as follows:

> 1. The Right of Entry and Possession and First Amendment of Right of Entry and Possession executed on behalf of the parties

---

trial, requested that the condemnation proceeding be dismissed because (1) the condemnation would destroy existing public uses, (2) the Pipeline did not qualify as a common-carrier pipeline, (3) the size of the easement vastly exceeds the Pipeline's needs, and (4) the Pipeline did not comply with "numerous provisions" of Chapter 21 of the Texas Property Code.

have not terminated, remain in force and effect, and govern the scope of this proceeding: GRANTED.

5. The District shall take nothing on its claims for the alleged "unauthorized and trespassory use" of its property: GRANTED.

These rulings held that the Right-of-Entry agreement was still in effect and limited the scope of the following trial to those issues permitted in the Right-of- Entry agreement.

3. The District's paramount public importance defense is foreclosed as a matter of law: GRANTED.

The Pipeline's motion in support of this summary-judgment ruling asserted three grounds: (1) that the District had waived the right to assert a paramount-public-importance defense when it entered into the Right of Entry and Possession Agreements and accepted compensation therefor; (2) that the defense was not applicable because the pipeline and stormwater detention are not incompatible uses, and (3) that the District was estopped from asserting this defense by entering into the Right of Entry and Possession Agreements and authorizing construction of the pipeline along an agreed-upon route. The trial court's partial summary judgment did not specify upon which ground it granted the summary judgment.

The trial court also denied the Pipeline's motions in part:

2. The "sole purpose" of this proceeding is to provide the District the opportunity to pursue recovery of the costs, if any, encompassed by paragraph 1.a. of the parties' Right of Entry and Possession: DENIED.

11

4. The District shall take nothing on its claim for the alleged "failure to comply with the terms of the parties' right-of-entry agreement": DENIED.

These rulings reserved for trial the issues of (1) construction of the Right-of-Entry agreement and (2) whether the Pipeline had breached the agreement.

## I. The Trial

The case was tried to the bench in a nine-day trial. The District called seven witnesses: its General Manager, its Engineer, a second engineer, an appraiser, two Pipeline employees, and the President of the District. The District requested that the trial court award it $34,316,165.00 in additional compensation and for damages caused by the Pipeline's breaches of the Right-of-Entry agreement.

The Pipeline called five witnesses: its Vice-President of Engineering and Construction, a hydrology expert, an engineering expert, the District's outside counsel, and an appraiser. The Pipeline requested that the trial court award the District additional compensation in the amount of $160,000.

## J. The Final Judgment

In the final judgment, the trial court found that the Right-of-Entry agreement:

(i) Provided for payment to [the District] of "initial compensation" of $493,287.50 and "additional compensation" of $20,937.50, which sums were paid to and accepted by [the District];

(ii) Established the alignment of and terms for the construction and operation of the pipeline;

12

(iii) Provided that [the District] would not contest [the Pipeline's] authority to acquire the Easement and Temporary Workspace; and

(iv) Established the scope of and remaining compensation issues to be resolved in this proceeding.

The final judgment also noted that the District's "pleading alleged that [the Pipeline] breached the Right of Entry Agreements," found that the Pipeline "did not breach the Right of Entry Agreements," and ordered that the District "shall TAKE NOTHING on its claim that [the Pipeline] breached the Right of Entry Agreements."

Finally, the trial court awarded the District "additional compensation" in the amount of $160,000.00, provided that the judgment superseded the Right-of-Entry agreements and granted the Pipeline a permanent easement over the property.

### K. Findings of Fact and Conclusions of Law

Thereafter, the trial court signed Findings of Fact and Conclusions of Law. Regarding the Right-of-Entry agreement, the trial court found that (1) the Pipeline paid and the District accepted $493,287.50 as "initial compensation, (2) paragraph 1.a of the agreements permitted the District to seek additional compensation if certain "adjustments, encasements, or modifications" were made during the construction of the pipeline, and (3) paragraph 3 of the agreements limited the scope of the Condemnation proceeding for the "sole purpose" of permitting the District to recover any additional compensation permitted by paragraph 1.a. The findings also

13

noted that the Pipeline paid, and the District accepted, an additional $20,937.50 as "additional compensation" in connection with the First Amendment Right of Entry and Possession, which was caused by adjusting the route of the pipeline.

The trial court also found that "[a]t trial, the District sought additional compensation totaling $34,316,165, subject to an offset for the compensation that [the Pipeline] previously paid in conjunction with the execution of the Right of Entry Agreements." These claims were based on an alleged diminution of the value of the property subject to the easement, costs of temporary workspace easements, and costs to cure an asserted diminution of the value of the remainder of the District's property. The trial court noted that some of these claims by the District were "being pursued as damages for the alleged breach of the Right of Entry and Possession." Except for the District's claim for $160,000.00 for the restoration of portions of the property impacted by the construction of the Pipeline, the trial court held that either (1) the claim was not permitted by paragraph 1.a, which limited the types of claims the District could pursue, or (2) were not proved by a preponderance of the evidence, or (3) both.

The District does not challenge any of the specific Findings of Fact or Conclusions of Law on appeal.

## II. GOVERNMENTAL IMMUNITY

In issue one, the District contends that, as a subdivision of the State, the District enjoys immunity from condemnation suits. The District further contends that (1) the Legislature has not clearly and unambiguously waived the District's immunity from condemnation suits, and (2) the District did not waive its immunity from suit by entering into the Right-of-Entry agreement.

### A. *The Nature of Governmental Immunity*

The doctrine of sovereign immunity[7] derives from the common law and has long been part of Texas jurisprudence. *See Hosner v. DeYoung,* 1 Tex. 764 (1847) (holding that State could not be sued in its own courts absent its consent "and then only in the manner indicated"). Immunity in Texas embodies two concepts: immunity from liability and immunity from suit. *City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011). Immunity from liability protects governmental entities from judgments, while immunity from suit completely bars actions against those entities unless the Legislature expressly consents to suit. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("[I]mmunity from suit . . . bars suit against [a governmental] entity

---

[7] Sovereign immunity protects the state and its various divisions, such as agencies and boards, from suit and liability, whereas governmental immunity provides similar protection to the political subdivisions of the state. *See Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011). For purposes of this opinion, we use the term immunity to refer to governmental immunity.

altogether."); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003) ("Unlike immunity from suit, immunity from liability does not affect a court's jurisdiction to hear a case and cannot be raised in a plea to the jurisdiction.").

## B. Standard of Review

If a governmental unit has immunity from suit, the trial court lacks subject-matter jurisdiction. *Tex. Dep't of Park & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Dall. Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("[A]n appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all."). Governmental immunity may be raised for the first time on appeal. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 96 (Tex. 2012). When reviewing a claim of immunity raised for the first time on appeal, we construe the pleadings in favor of the party asserting jurisdiction, and, if necessary, review the record for evidence supporting jurisdiction. *Id.* In some instances, the pleadings or record may conclusively negate the existence of jurisdiction, in which case the suit should be dismissed. *Id.* But, if the pleadings and record neither demonstrate jurisdiction nor conclusively negate it, in order to obtain dismissal of the plaintiff's claim, the governmental entity has the burden to show either that the plaintiff failed to show jurisdiction despite having had full and fair opportunity in the trial court to develop the record and amend the pleadings; or, if such opportunity was not given,

that the plaintiff would be unable to show the existence of jurisdiction if the case were remanded to the trial court and such opportunity afforded. *Id.* If the governmental entity meets this burden, then the appellate court should dismiss the plaintiff's case. *Id.*

## C. Legislative Waiver or Judicial Abrogation?

Texas law provides two possible avenues through a governmental entity's claim of immunity from suit. We briefly discuss each.

### 1. Legislative Waiver

The judiciary generally defers to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy concerns associated with allowing suits to proceed against the government. *Reata*, 197 S.W.3d at 375, *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002). Section 49.066(a) of the Texas Water Code, which gives the District the right to "sue and be sued" does not waive the District's immunity from suit. *See Tooke*, 197 S.W.3d at 342; *Bexar Metro. Water Dist. v. Educ. and Econ. Dev. Joint Venture*, 220 S.W.3d 25, 30–31 (Tex. App.—San Antonio 2006, pet. dism'd). At least one court of appeals has held that section 181.004 of the Texas Utilities Code, which gives certain utility corporations the power of eminent domain to condemn the land of "any person," is not a waiver of immunity from suit when the corporation with the eminent domain power seeks to use it against a governmental entity. *See Dallas*

17

*Area Rapid Transit v. Oncor Elec. Delivery Co.*, 331 S.W.3d 91, 106 (Tex. App.—

Dallas 2010), *rev'd on other grounds*, 369 S.W.3d 845 (Tex. 2012).

The Pipeline, like the utility corporation in *Oncor*, has a statute providing that

it "may acquire by condemnation *any land*[,]" which arguably includes

governmentally owned land. *See* TEX. WATER CODE § 49.222(a) (emphasis added).

However, the Corpus Christi Court of Appeals, citing *Oncor*, has held that this grant

of condemnation power over "any land" does not waive immunity from suit when

the water district seeks to condemn land owned by a governmental entity. *See*

*Hidalgo Cnty. Water Improvement Dist. v. Hidalgo Cnty. Water Irrigation Dist. No.*

*1*, 627 S.W.3d 529, 540 (Tex. App.—Corpus Christi 2021, pet. filed).

Neither party cites authority in which the supreme court has addressed

whether a grant of eminent domain power over "any property" waives immunity

from suit when the entity possessing that power seeks to use it against a

governmental entity.[8] When reviewing the court of appeals' decision in *Oncor*, the

supreme court noted that "whether [the grant of eminent domain power] clearly and

---

8    We note that in *Texas Turnpike Authority. v. Shepperd*, 279 S.W.2d 302, 306 (Tex. 1955), the supreme court decided that a statutory provision giving the Turnpike Authority the power "to exercise the power of condemnation of property for public use, any land . . .[,]" included the power to condemn land in a city. *Id.* We note, however that the supreme court also referenced other provisions of the Turnpike Authority Act that "authorized the Authority to purchase or condemn public or private lands" and defined an "owner" to include governmental entities. *See id.* There was no specific discussion of sovereign immunity; the case was discussed in terms of condemnation power.

18

unambiguously waives a government landowner's immunity is a difficult question," before deciding that question is "one we need not answer here[.]" 369 S.W.3d at 849–50. Instead, the supreme court concluded that another, more specific statute applicable in that case waived immunity. *Id.* And, the issue, which is squarely raised in the petition for review in *Hidalgo County Water Improvement*, is still pending before the supreme court.

### 2. *Judicial Abrogation*

Recognizing that sovereign immunity is a common-law doctrine, the supreme court has left open the possibility that the judiciary may modify it or abrogate it by modifying the common law. *Reata*, 197 S.W.3d at 375. When sovereign immunity is inapplicable due to the judicial modification rather than legislative pronouncement, courts characterize the protection's absence as arising from abrogation rather than waiver. *State ex rel. Best v. Harper*, 562 S.W.3d 1, 17 (Tex. 2018).

In *Federal Sign v. Texas Southern University*, 951 S.W.2d 401, 408 (Tex. 1997), the supreme court held that a governmental entity does not waive[9] immunity from a breach-of-contract suit simply by entering into a contract for goods and

---

[9]     Although cases often use the term waiver-by-conduct, the supreme court has clarified that abrogation is a more appropriate term. Whenever we use the term "waiver," to discuss a loss of immunity through anything other than legislative authority, we are applying the law of judicial abrogation. *See State ex rel. Best v. Harper*, 562 S.W.3d 1, 17 (Tex. 2018).

19

services. However, in a footnote, the court suggested that "[t]here may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts." *Id.* at 408 n.1. Justice Hecht concurred, stating that "today's decision does not hold that the State is always immune from suit for breach of contract absent legislation, it holds only that the mere execution of a contract for goods and services, without more, does not waive immunity from suit." *Id.* at 413 (Hecht, J. concurring).

### *a. By Conduct*

Since *Federal Sign*, the supreme court has had the opportunity to clarify what sort of conduct, if any, would warrant a waiver-by-conduct exception, but it has not done so. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011) ("We reject the invitation to recognize a waiver-by-conduct exception in a breach of contract suit against a governmental entity.); *Tex. A. & M. Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007); *Catalina Dev., Inc. v. Cnty. of El Paso*, 121 S.W.3d 704, 705–06 (Tex. 2003*); see also IT-Davy*, 74 S.W.3d at 857 ("Creating a waiver-by-conduct exception would force the State to expend its resources to litigate the waiver-by-conduct issue before enjoying sovereign immunity's protections—and this would defeat many of the doctrine's underlying policies.").

20

This Court, however, has recognized a waiver-by-conduct abrogation of a governmental entity's immunity from suit. In *Texas Southern University v. State Street Bank & Trust Company*, 212 S.W.3d 893, 907 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), Texas Southern University ("TSU") contractually agreed to lease physical-plant equipment from CMS Viron Corporation ("Viron"). Attached to the Master Lease between TSU and Viron was a letter authored by TSU's counsel, upon which Viron was entitled to rely. *Id.* at 898. The letter assured Viron that the Master Lease was legal, valid, binding, and enforceable, and that, in the event of a judgment for money damages, TSU would be "obligated to pay" any judgment. *See id.* After Viron delivered the equipment and provided approximately $13 million in equipment and services to TSU, TSU declared the Master Lease void and unenforceable. *See id.* at 898–99. Viron filed suit, and TSU claimed immunity from suit. *See id.* at 897. This Court found that, through its conduct, TSU had waived its right to immunity, stating:

> [Viron] contends that . . . the injustice is even worse, because this case also includes an additional fact that appears in none of the prior cases: The government officials lured Viron into the Master Lease with false promises that the contract would be valid and enforceable, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all.

> We agree. Based on the facts before us, we overrule point of error one and hold that sovereign immunity does not defeat the trial court's subject-matter jurisdiction over Viron's claims for breach of contract.

21

*State St. Bank*, 212 S.W.3d at 908. Based on the "extraordinary factual circumstances" presented in the case, this Court concluded that the case fit within the circumstances of the waiver-by-conduct exception suggested, but never applied, by the supreme court in *Federal Sign. Id.*

### b. Through Litigation

The supreme court *has* recognized a variation on the waiver-by-conduct exception for cases in which the governmental entity voluntarily engages in certain litigation. The supreme court discussed the reasoning behind such an exception as follows:

> However, if the governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs. If the opposing party's claims can operate only as an offset to reduce the government's recovery, no tax resources will be called upon to pay a judgment, and the fiscal planning of the governmental entity should not be disrupted. Therefore, a determination that a governmental entity's immunity from suit does not extend to a situation where the entity has filed suit is consistent with the policy issues involved with immunity. In this situation, we believe it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it. *See Guar. Trust Co. v. United States*, 304 U.S. 126, 134–35, 58 S. Ct. 785, 82 L. Ed. 1224 (1938) (noting that the rule allowing claims against a foreign sovereign that has asserted its own claims is assumed to be founded on principles of justice); *see also Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 813 (Tex. 1983) (stating that fundamental fairness requires parties to be heard on the merits of their cases).

*Reata*, 197 S.W.3d at 375–76.

22

Accordingly, the supreme court has abrogated the state's immunity in cases in which the governmental entity initiated the lawsuit. *See Anderson, Clayton & Co. v. State ex rel. Allred*, 62 S.W.2d 107, 110 (Tex. Comm'n App. 1933) ("[W]here a state voluntarily files a suit and submits its rights for judicial determination it will be bound thereby and the defense will be entitled to plead and prove all matters properly defensive. This includes the right to make any defense by answer or cross-complaint germane to the matter in controversy."); *Kinnear v. Tex. Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex. 2000) ("Because the Commission initiated [the] proceeding under the Texas Fair Housing Act, and Kinnear claimed attorney's fees as a consequence of that suit, the jurisdictional question in this case was answered when the Commission filed suit"). The exception has also been applied when a governmental entity intervened in a suit to seek damages. *See Reata*, 197 S.W.3d at 371, 373 (holding that city's decision to intervene and seek damages "encompassed a decision to leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to the claims the City asserts," but limits waiver to extent that counterclaim offsets state's own claim). The supreme court has recently held that, even without an affirmative claim for damages by the state, the state was not entitled to immunity from a counterclaim for attorney's fees when it intervened in a case involving the Texas Citizen's Protection Act. *See Best*, 562 S.W.3d at 20.

23

*3. Analysis*

We believe that in this case the District's participation in the condemnation litigation results in an abrogation of its right to claim immunity from suit. It is true that the District did not file the condemnation suit, nor did it intervene in it. As such, it appears distinguishable from both *Kinnear* and *Reatta*. But, although the District did not file or intervene in the lawsuit, there is evidence that the District procured its filing. The Pipeline's September 3, 2018 email to the District's counsel stated,

> Based on our last discussion, we understand that ***it is the District's preference that Magellan/V-Tex initiate a condemnation proceeding to assure there is a process by which the District can pursue the scheduling of a Special Commissions hearing*** following the parties' execution of a right of entry agreement. We are preparing the proceeding for filing. (emphasis added).

The District's counsel responded in a September 4, 2018 email, stating, "Very good. Thank you." Additionally, when the District entered into the Right-of-Entry agreement, the District clearly indicated that it was contractually agreeing to participate in the condemnation proceeding. The District promised that it would "not contest [the Pipeline's] authority to acquire the Easements" in the condemnation proceeding, and, in return, it would "be entitled to pursue recovery of additional compensation." And finally, we note that the District did, in fact, initiate the *judicial* portion of the condemnation proceeding by filing Objections to the Award of Special Commissioners. *See Beck*, 196 S.W.3d at 786 ("Upon the filing of objections, the award is vacated and the administrative proceeding converts into a judicial

24

proceeding."); *see also Gulf Energy Pipeline Co. v. Garcia*, 884 S.W.2d at 821, 823 (Tex. App.—San Antonio 1994, no pet.) (noting that without timely filed objection, eminent-domain proceeding never becomes civil case).

This is not a case in which the District was dragged unwillingly into a judicial proceeding. Even though the District did not file or intervene in the lawsuit, we see no meaningful distinction when, as here, it compels the filing of the lawsuit and contractually agrees to participate in it in order to seek additional compensation and breach-of-contract damages.

Also, the District did not limit its participation in the suit "to pursu[ing] recovery of additional compensation" above what it had already agreed to and accepted in connection with the Right-of-Entry agreements; the District sought to receive *damages* for the Pipeline's alleged breach of the Right-of-Entry agreements. In unchallenged findings of fact, the trial court found as follows:

> The District, by way of its Counsel, acknowledged that this claim for additional compensation of $2,304,609 was being pursued *as damages for the alleged breach* of the Right of Entry and Possession.
>
>     * * * *
>
> Counsel for the District, on behalf of the District, acknowledged that this claim for additional compensation of $236,456 was being pursued *as damages for the alleged breach* of the Right of Entry and Possession.
>
>     * * * *
>
> *The District contends that [the Pipeline] breached* numbered paragraph 1 of the Right of Entry and Possession by failing to pay additional compensation the District claimed was due pursuant to that paragraph.

25

\* \* \* \*

Based on the preponderance of the credible evidence presented at trial, the Court finds that [the Pipeline] *did not breach numbered paragraph 1 of the Right of Entry and Possession*.

As these findings of fact make clear, the District did not simply oppose the Pipeline's condemnation, it affirmatively sought to contest the compensation awarded by the Special Commissioners and to recover *damages* caused by the Pipeline's alleged breach of the Right-of-Entry agreement. "When [a governmental entity] asserts an affirmative claim for damages, [the entity] steps outside the sphere of its immunity from suit to the extent [] described in *Reata*." *Nazari v. State*, 561 S.W.3d 495, 507 (Tex. 2018).

In *Hidalgo County*, the same court that found no legislative waiver in the statute granting a water district condemnation power over "any land" also considered the circumstances under which a governmental entity's immunity from suit might be judicially abrogated by its participation in a condemnation suit. *See* 627 S.W.3d at 538. In doing so, the court of appeals noted:

> The Irrigation District contends that . . . a landowner is not a willing participant in a condemnation proceeding, and thus a governmental landowner will be compelled to expend public funds to defend itself. We agree—to an extent.
>
> ***If a condemnation proceeding becomes necessary because the parties cannot agree on just compensation, then presumably the governmental landowner has made a calculated decision to expend***

26

***resources to pursue additional compensation—a voluntary decision that does not implicate immunity****. See id.* at 375 ("[I]f the governmental entity . . . chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs."). We also recognize that the condemnation scheme is designed to promote early settlement between the parties and avoid unnecessary litigation costs. *In re Lazy W Dist. No. 1*, 493 S.W.3d at 542; *Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 184 (Tex. 2004). However, where the governmental landowner objects to an award on a non-monetary basis, as in this case, then the costs of defending the lawsuit would constitute "unforeseen expenditures that could hamper governmental functions." *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) (citing *IT–Davy*, 74 S.W.3d at 854). On balance, because we must consider how our ruling would affect all governmental landowners, we think this consideration weighs in favor of applying immunity.

*Hidalgo Cnty.*, 627 S.W.3d at 538.

This case, however, presents the exact situation that the court in *Hidalgo County* would have considered sufficient to abrogate immunity. The condemnation proceeding was filed, *at the District's request*, precisely for the reason mentioned in *Hidalgo County*, i.e., because the District and the Pipeline could not agree on the amount of "just compensation," and the District "made a calculated decision to expend resources to pursue additional compensation." *Id.*  In fact, the parties contractually limited the issues in the condemnation proceeding to the District's compensation, stating in the contract that "the sole purpose of the [condemnation] Proceeding shall be to ensure that the District has a means for pursuing recovery of

27

the costs, if any encompassed by paragraph 1.a [of the agreement] in the event the parties are unable to reach an agreement on the amount of such costs, if any."

We agree that, by compelling the filing of the condemnation proceeding and contractually obligating itself to participate, plus requesting "additional compensation" above the amount it had already been paid and accepted *and* seeking breach-of-contract damages in addition to "just compensation," the District "was not operating within sovereign immunity's bounds" and its immunity from suit is abrogated.

Accordingly, we overrule the District's first issue. Because we hold that the District's governmental immunity has been abrogated by its participation in the condemnation proceeding, we need not decide whether there is also a legislative waiver or other waiver-by-conduct,[10] and we decline to do so. *See* TEX. R. APP. P. 47.1.

---

[10]    We do note many similarities between this case and the case in which this Court found waiver by conduct. In *Texas Southern University v. State Street Bank & Trust Company*, 212 S.W.3d 893, 897 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), we found waiver-by-conduct because the governmental entity "lured" the plaintiff into signing a contract with "false promises that the contract would be valid and enforceable." In this case, the District required the Pipeline to file the condemnation proceeding and falsely promised that "[t]he District will not contest (i) [the Pipeline's] authority to acquire the Easements."

28

**THE PIPELINE'S AUTHORITY TO CONDEMN**

In issue two, the District contends that (1) the Pipeline "lack[s] evidence to substantiate [its] common-carrier status,[11] and (2) the District's use of the easement serves an issue of "paramount public importance" over the Pipeline's use of the same property.[12] The District further contends that, because both of these requirements are jurisdictional, they cannot be waived and can be raised for the first time on appeal.

This argument counters the Pipeline's contention that the District waived these issues when it agreed (1) that it would "not contest [the Pipeline's] authority to acquire the Easements" and (2) that the "the sole purpose of the [condemnation] Proceeding shall be to ensure that the District has a means for pursuing recovery of the costs, if any, encompassed by paragraph 1.a. above in the event the parties are unable to reach an agreement on the amount of such costs, if any." If the condemnation requirements the District complains of here are, in fact, issues of subject-matter jurisdiction, it would be irrelevant that the District contractually

---

[11]    To have eminent domain authority the Pipeline must qualify as a common carrier. *See* TEX. NAT. RES. CODE § 111.019(a); § 111.002 (defining common carriers)

[12]    *See Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth.*, 258 S.W.3d 613, 616–17 (Tex. 2008) ("We have long held that condemnees may prevent a condemnation when the property is already devoted to another public use and the condemnee establishes that the new condemnation would practically destroy the use to which it has been devoted.") (internal quotations and citations omitted)

29

waived them because subject-matter judication cannot be waived. *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004) (holding that subject-matter jurisdiction cannot be waived and can be raised at any time); *see also* TEX. GOV'T CODE § 311.034 ("Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity").

## A. Jurisdictional Prerequisites?

The District's arguments are based on the contention that, as a jurisdictional prerequisite to bringing suit, the Pipeline was required to prove (1) its common-carrier status and (2) that its use of the easement would not destroy or materially affect the District's current and future uses of the property.

### 1. Common-Carrier Status

Regarding common-carrier status, we find the case of *Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline—Texas, LLC.*, 363 S.W.3d 192 (Tex. 2012) to be helpful. In *Denbury*, the supreme court was asked to decide whether a landowner could challenge in court the eminent-domain power of a pipeline owner, i.e., whether the Pipeline was a common carrier. 363 S.W.3d at 195. The supreme court concluded that nothing prohibited the landowner from challenging the pipeline's common-carrier status in court, even though the pipeline had received a permit from the Railroad Commission to construct the pipeline. *Id.* at 200.

However, the supreme court *did not* make common-carrier status an element of the pipeline's case or say that it was required to prove common-carrier status as a jurisdictional prerequisite. Instead, the supreme court stated that "once a landowner challenges [common-carrier] status, the burden falls upon the pipeline company to establish its common-carrier bona fides if it wishes to exercise the power of eminent domain." *Id.* at 202. And, when the pipeline was unable to establish common-carrier status as a matter of law, the supreme court remanded the case; it did not dismiss it for want of jurisdiction. *Id.* at 204.

The supreme court's treatment of the common-carrier issue in *Denbury* leads us to conclude that, while common-carrier status may be challenged by the condemnee in a condemnation proceeding, proof of it by the condemnor is not a jurisdictional prerequisite to bringing the suit. Our conclusion is consistent with the supreme court's holding in *Hubenak v. San Jacinto Gas Transmission Coompany*, 141 S.W.3d 172, 184 (Tex. 2004), in which the supreme court held that the "unable to agree" requirement contained in section 21.012 of the Texas Property Code [regarding filing requirements of a condemnation petition] does not implicate subject-matter jurisdiction and noted that "the modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *Id.* at 182 (citing *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000)).

Although common-carrier status is required to exercise condemnation authority, because is not a jurisdictional prerequisite, proof of it can be agreed to or waived by the parties.

### 2. *"Paramount Public Importance"*

We similarly note that the "paramount-public-importance" test is invoked only if the condemnee first establishes that the condemnation of its property would practically destroy the existing use of that part of the property that the condemnor seeks to condemn. *See City of Houston v. Ft. Worth & Denver Ry. Co.*, 619 S.W.2d 234, 237 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) (noting that once condemnee showed that new use "would practically destroy" existing use, burden shifts to condemnor to prove that its use is of "paramount importance" and could not be accomplished "in any other practical way"). In other words, the "paramount-public-importance" doctrine is a defense to a proposed condemnation. If the District raises it by showing that its own use will be practically destroyed and the Pipeline does not rebut it by showing its use is of paramount importance, the Pipeline may not be allowed to condemn, but the trial court's jurisdiction is not implicated. *See Austin Indep. Sch. Dist. v. Sierra Club*, 495 S.W.2d 878, 882 (Tex. 1973) (holding that whether governmental entity could condemn when issue of "paramount public importance" is raised "does not go to the jurisdiction of the County Court at Law but was a matter to be resolved by that court in the exercise of

its jurisdiction"); *Town of Westlake v. City of Southlake*, No. 02-21-00241-CV, 2021 WL 6069104, at \*14 (Tex. App.—Fort Worth Dec. 23, 2021, no pet. h.) ("The doctrine of paramount importance presents not a jurisdictional issue but an issue to be litigated during the merits because the doctrine 'does not implicate the power of one unit to bring the other to court; rather, the issue is resolved by the commissioners in the condemnation suit.'") (citing *State v. Montgomery Cnty.*, 262 S.W.3d 439, 445 (Tex. App.—Beaumont 2008, no pet.)).

### 3. Waiver

Because we have held that the issues raised in the District's second issue—common-carrier status and the paramount-public-importance doctrine—are not jurisdictional, but merely affect the condemnor's right to relief, they are issues that the parties may stipulate to or waive the requirement of proof thereon.

In its Findings of Fact and Conclusions of Law, the trial court found that "[t]he Right of Entry and Possession is unambiguous," and it also noted that:

> Numbered paragraph 3 of the Right of Entry and Possession established the scope of this proceeding would be limited to determining the amount of additional compensation, if any, due pursuant to paragraph 1.a providing in relevant part:
>
>> The sole purpose of the Proceeding shall be to ensure that the District has a means for pursuing recovery of the costs, if any encompassed by paragraph 1.a. above in the event the parties are unable to reach an agreement of such costs, if any.

In its August 28, 2020 partial summary judgment, which is incorporated into the final judgment, the trial court found that "[t]he District's paramount public importance defense is foreclosed as a matter of law."

And, in the Right of Entry and Possession, which the trial court found to be unambiguous, a conclusion of law not challenged on appeal, the District promised that it "w[ould] not contest [the Pipeline's] authority to acquire the easements[.]"

By contractually agreeing that it would not contest the Pipeline's authority to condemn the easement and limiting the scope of the proceeding to any "additional compensation" it might be due, the District has waived its right to complain about the issues raised in its second issue.

## B. Other Reasons to Deny Issue Two

Even if we were to consider the issue of common-carrier status, we would conclude that the trial court did not err in its implicit ruling that the Pipeline was a common carrier.

In its live pleading, the Pipeline alleged that "Petitioners are engaged as common carriers in the pipeline business[.]"

At trial, Mark McKenzie used the analogy of a toll road to explain how its pipeline operates.

> We have third parties that —we don't own any of the vehicles or the product, but we have customers or vehicles that enter [the pipeline] at that location, that leave at that location and they pay us for our infrastructure.

34

When specifically describing the pipeline project, McKenzie testified:

> But this project really started where we had several customers looking to really grow their market in Dallas, Waco, Austin, Houston. We– basically we have an existing pipeline that goes from Houston to Frost which is just kind of south of Dallas. We have a pipeline network into Dallas. We have a pipeline network that goes west out to Midland/Odessa and on to El Paso as well. We had customers asking for more capacity. So[,] we evaluated several different options. The pipeline system that we have is really—it did not have the capacity to support the opportunity. So[,] once we realized that, we went out for what we call an open season. We got enough commitments, volume commitments, so basically loading commitments from various destinations that would support the project.

Construing the pleadings in favor of the Pipeline and reviewing the record for evidence to support the judgment, *see Rusk*, 392 S.W.3d at 96, the trial did not err in concluding that there was sufficient evidence to show that the Pipeline was a common carrier. *See Denbury Green Pipeline–Texas*, 510 S.W.3d at 917 (discussing proof necessary to establish common-carrier status and stating: "[E]vidence establishing a reasonable probability that the pipeline will, at some point after construction serve even one customer unaffiliated with the pipeline owner is substantial enough to satisfy public use[.]").

Regarding the paramount-public-importance issue, the District acknowledges that "the doctrine of paramount public use currently requires a condemnee to demonstrate that its existing public use of the property will be materially impaired or practically destroyed before possibly benefitting from the doctrine," but the

35

District asks this Court to enlarge the doctrine to place the initial burden on the condemnor to show that its proposed use will not destroy a current use or an "essential future public use[]."

As an intermediate appellate court, we are bound by existing Texas Supreme Court authority and decline the District's invitation to alter the burden of proof or to expand the law on the paramount-public-importance defense. *See Arce v. Am. Nat'l Ins. Co.*, 633 S.W.3d 228, 235 (Tex. App.—Houston [1st Dist.] 2021, pet. filed) ("As an intermediate appellate court, this court is duty-bound to follow precedent issued by the Texas Supreme Court.").

Thus, even if we were to conclude that the common-carrier and paramount-public-importance issues were not waived when the District entered into the Right-of-Entry agreements, we would nonetheless overrule issue two.

Accordingly, we overrule issue two.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Countiss and Farris.

36